**Joanne T. CARDINALE**

v.

**Norman A. CARDINALE.**

**No. 2004–58–Appeal.**

Supreme Court of Rhode Island.

Jan. 9, 2006.

Maureen Gemma, Esq., Cranston, for Plaintiff.

James A. Bigos, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

The plaintiff, Joanne T. (DiCarlo) Cardinale (Joanne), and the defendant, Norman A. Cardinale (Norman), are no strangers to the Rhode Island Supreme Court. During the last four years, the Cardinales repeatedly have come before us seeking emergency relief and filing petitions for writs of certiorari in connection with their bitterly contested, procedurally defective, bifurcated divorce proceeding. During that time, this Court has issued no fewer than thirty-five separate orders and granted six writs of certiorari. Indeed, if we administered a frequent flyer program, the Cardinales undoubtedly would be platinum members.[1]

---

1. Despite this Court's frustration with what appears to be a never-ending merry-go-round of litigation between this former husband and wife, we realize that the parties themselves are not entirely to blame. In addressing the assignments of error alleged by Joanne in this appeal, we also shall endeavor to address the ill-conceived, institutional practice of bifurcated divorce proceedings. We previously have declared that this practice should not be available when there has been noncompliance with discovery orders and held that this so-called bifurcation procedure is not a case-management tool; we now seize this opportunity to strictly limit the practice. *See Koutroumanos v. Tzeremes*, 865 A.2d 1091, 1094 n. 2 (R.I.2005) (Noting that the decision to bifurcate a divorce proceeding lies within the sound discretion of the trial justice, but also stating that this procedure ought to be the

This current appeal was taken by Joanne from the entry of final judgment in Family Court.[2] Notwithstanding the procedural anomalies that will be addressed in this opinion, the scope of Joanne's appeal relates only to those issues that were contested after the parties were granted a divorce: equitable distribution, alimony, and child support. For the reasons that follow, we vacate the "Amended Judgment" and direct the entry of a new judgment in accordance with this decision.

## Facts and Travel of the Case

The parties were married on June 28, 1981, in West Warwick, Rhode Island. They produced two children. Lauren was born on March 21, 1985, and Jordan was born on April 27, 1990. After the birth of their first child, Joanne gave up her job as a barber and became a full-time mother and homemaker. She bore the primary responsibility of child-rearing. Norman, a self-employed businessman, was responsible for the family income and finances.

Marital problems began in 1999; Joanne was diagnosed with breast cancer and began receiving chemotherapy and radiation therapy. At the same time, she alleges that Norman's behavior began to change. According to Joanne, Norman lost weight and began to dress differently, in addition to socializing with friends and employees more often. Norman acknowledged taking his young female office manager on trips and buying her jewelry. In April 2001, the parties separated,[3] and Joanne initiated divorce proceedings on August 14, 2001, citing infidelity as grounds for divorce. She later amended her complaint to a claim of "irreconcilable differences."

On November 27, 2001, after a case-management conference with a justice of the Family Court, an order was entered directing that discovery be closed as of January 8, 2002. This was the first of innumerable orders that were disregarded. On January 29, 2002, another pretrial conference was held, and a Family Court justice ordered the trial set for March 27, 2002. This date passed without a trial.

In the months that followed, the parties repeatedly appeared in Family Court. Most appearances during the initial stages of this proceeding were devoted to Joanne's preliminary motions. Joanne had filed several motions seeking to compel Norman's compliance with court orders concerning support payments, the handling of marital assets, and outstanding discovery requests. These motions also typically included requests to adjudge Norman in contempt. Although the court would order Norman to comply with its orders and respond to Joanne's discovery requests, Norman never was adjudged in contempt and we can discern little or no judicial effort toward enforcement.

The original March 27, 2002 trial date was continued several times because of Norman's alleged failure to comply with discovery and, on occasion, by agreement of the parties. On December 3, 2002, the

exception and not the norm and that the reasons for bifurcating issues must be placed on the trial record.).

2. The record discloses that a purported "final judgment" of divorce entered on April 4, 2003 and a document entitled "Amended Judgment" entered on June 1, 2004. The labeling of these orders as so-called final judgments has contributed to the errors in this proceeding.

3. Shortly thereafter, Joanne alleges, she received a phone call from John Vallee, who told her that Norman was having an affair with his wife, Monica Vallee. Norman admitted to having a relationship with Monica while married to Joanne. Monica is a different woman from the aforementioned office manager.

trial justice declared that no further continuances would be granted and that trial would be set for December 16, 2002,[4] yet another trial date that passed. However, on December 16, 2002, several events occurred. The trial justice ordered Joanne's counsel to notify Norman's counsel, in writing, of all outstanding discovery requests and gave counsel one week to submit any additional interrogatories. Although the trial justice scheduled the next hearing for January 2, 2003, counsel for defendant requested that the proceeding be bifurcated. Without any findings about the appropriateness of this procedure, the court and the parties agreed to a bifurcated divorce.

Thus, on January 2, 2003, the divorce proceeding was bifurcated, and the parties embarked upon this long, painful, bitter dispute over the remnants of the marital estate. In an interlocutory decision pending entry of final judgment, both parties were granted an absolute divorce based on irreconcilable differences that caused the irremediable breakdown of their marriage. The parties were awarded joint custody of their two children, with Joanne having physical possession and Norman receiving all reasonable rights of visitation. Norman's support obligation was reduced from $800 to $400 per week. Lastly, the decision provided that the remaining issues of child support, equitable assignment of property, and alimony would be addressed at the next scheduled hearing. In sum, notwithstanding the significant unresolved discovery issues, a divorce was granted that purportedly became final on April 4, 2003.

In the interim, according to the papers filed with the Family Court, Joanne obtained new counsel, who filed two emergency motions: a motion to set aside the interlocutory decision pending entry of final judgment and, alternatively, a motion to stay the entry of final judgment. Counsel alleged that not enough information was disclosed in discovery to discern the nature and extent of the marital estate. Joanne also provided the court with a comprehensive accounting of the many prior orders that Norman had disregarded, including simple discovery requests. On April 4, 2003, the trial justice denied Joanne's motions and ordered the entry of "final judgment."

Joanne petitioned this Court for certiorari. However, because of the interlocutory posture of the proceeding, the parties agreed to voluntarily withdraw the petition, without prejudice, with the expectation that the remaining discovery issues would be resolved harmoniously. Such was not the case.

Joanne attempted to undertake additional and comprehensive investigation of Norman's assets and financial worth. This endeavor proved contentious; Joanne filed numerous motions to compel discovery and motions seeking to hold Norman in contempt with respect to prior discovery orders. Norman objected to these motions by challenging procedural defects in Joanne's discovery demands. This acrimony was compounded by the trial justice's failure to timely hear and decide these issues.

After becoming concerned that Norman had attempted to encumber certain marital assets to satisfy outstanding business loans for nonmarital property, Joanne sought an emergency restraining order from the trial justice. Norman objected to this motion and the pending discovery motions on the

4. We note that this order was entered on December 20, 2002, four days *after* the scheduled trial date.

ground that he was unprepared for a hearing. The trial justice refused to hear and decide Joanne's request for emergency relief and her numerous outstanding discovery motions, including motions to adjudge Norman in contempt.

Joanne requested that the trial justice recuse himself from the proceeding. She alleged that the trial justice had vacated a temporary support order without notice or a hearing, and four weeks later, again without a hearing, reinstated half the original amount, in the interlocutory decision pending entry of final judgment.[5] Joanne further alleged that the trial justice "has been unable or unwilling to control the [d]efendant or the proceedings" and that Joanne's ability to present her case and obtain an equitable distribution of the marital assets was compromised.

The trial justice initially denied the recusal request. However, after a discussion with the Chief Judge of the Family Court, the trial justice declared:

"I have had a discussion with the Chief Judge of this Court and the Chief Judge feels that [recusal] would be best served for all the parties because of the comments that were made in this courtroom today that it might prejudice me. And I indicated to him in my opinion that it would not. But he did not want this case jeopardized by any indication that the Court would, that the Court's judgment would be [clouded]. Therefore, on the recommendation of the Chief Judge of this Court, this matter is referred [ ] to [a different hearing justice]."

Thereafter, Norman and Joanne each filed petitions for writs of certiorari with

this Court; both were granted. Norman sought review of the recusal order and Joanne sought review of the trial justice's refusal to grant her requested relief, including the denial of her emergency motion to prevent Norman from alienating marital assets while the proceeding still was pending.

This Court determined that the issue of recusal is a "judicial question that must be answered by the justice to whom the motion is directed and not the administrative chief judge of the Court." We remanded the case to the trial justice to consider the issue of recusal. We further declared:

"This case is remanded to the Family Court with directions to hear and determine all outstanding motions forthwith and to conduct an evidentiary hearing as expeditiously as circumstances permit."

Additionally, we noted that the court order restraining Norman from "conveying, encumbering or otherwise alienating any and all assets" remained in effect. This restraining order still is outstanding.

Once the case returned to Family Court, the trial justice issued another order declining to recuse from the proceeding. Unfortunately, the trial justice, speaking as "an officer of the court," chose to provide commentary about his view of this Court's lack of appreciation of his caseload and the day-to-day workings of the Family Court. Specifically, he took issue with our directive to decide this case "forthwith" and declared, "I agree with [Norman's counsel] that I don't think the [the Supreme Court], the folks sitting up on the hill, understand fully what goes on here, of the caseloads involved."[6] The trial justice

---

**5.** According to Joanne, when she requested that the trial justice reconsider the support orders, he refused to do so in the absence of a written motion to modify and a hearing to demonstrate that a substantial change in cir-

cumstances had occurred such that modification of child support was warranted—the very procedural protections she had been denied.

**6.** Although we deem these remarks inappropriate, we do not share the trial justice's

did not comply with our directive that the case be decided forthwith.

Joanne filed another petition for certiorari seeking review of the trial justice's refusal to recuse. The petition ultimately was denied by this Court. Thereafter, with the passage of time, came further discovery requests by Joanne, countered by further objections from Norman. Eventually, by agreement of the parties, Joanne and Norman attempted to resolve all outstanding issues with the assistance of a mediator. Mediation was unsuccessful.

On October 10, 2003, Joanne alleged in an affidavit that Narragansett Electric had threatened to turn off her electricity because Norman had failed to pay the electric bill. She also sought injunctive relief against Narragansett Electric, to prevent termination of service until the marital assets were distributed. Joanne also filed yet another motion to adjudge Norman in contempt of prior orders that he pay the necessary household expenses. Norman responded that Joanne was to blame for the circumstances because she was unwilling to sell the family residence (in which she was living) to settle their financial obligations.

Joanne moved for the appointment of a commissioner and/or receiver to liquidate the marital assets.[7] Joanne alleged that the mortgages for both the family home and Norman's commercial property were several months in arrears and payments for all associated utility accounts were overdue. Joanne also alleged that Norman's businesses had been shut down and no longer were generating income. Consequently, because the marital home at 42 West Valley Road, Scituate, and the commercial property at 184 John Clarke Road, Middletown, were at risk of foreclosure, the trial justice appointed a Master of Properties (Master) to exercise control over these assets.

After preparing bid packages and marketing both properties, the Master informed the court that he had received an offer of $1,940,000 for the commercial property, the highest of four bids, and an offer of $560,000 for the marital home. Although the Master recommended court approval for both bids, these offers were withdrawn.

Joanne argued to the Family Court and again to this Court that the highest bidders for both the commercial property and the marital home withdrew their offers because of Norman's interference with the bid process and his misrepresentations about the properties. This, in turn, opened the door for Norman to make of-

concern that simply because he is assigned "between 25 and 40 cases a day on this calendar," litigants may "go dashing up to the Supreme Court" in order to obtain a more expeditious conclusion.

The tortured travel of this case however, has given rise to real concern about the caseloads facing the justices of the Family Court, particularly those assigned to the contested divorce calendar, one of the core functions of the Family Court. *See Lubecki v. Ashcroft*, 557 A.2d 1208, 1213 (R.I.1989) (The Family Court Act, G.L.1956 § 8–10–3 was intended to furnish to parties who have filed a petition for divorce, separation, or other relief in the Family Court a comprehensive resolution of property, contractual, and equitable disputes that have arisen between them.). We are equally concerned about the seemingly interminable nature of contested divorce proceedings. Once a contested case reaches trial in the Family Court, it should be concluded in a prompt manner, and the parties should not be required to return to court over and over again until the case is decided.

7. Joanne also apparently sought the appointment of a receiver in Superior Court. The Family Court trial justice ordered Joanne to pursue all matters relative to the marital estate in Family Court.

fers for both properties. Norman's bids ultimately were recommended by the Master and approved by the Family Court. Joanne took exception to the bidding process and the preferences that allegedly were shown to Norman. She additionally questioned why Norman was allowed to bid for both properties when his support obligations had been suspended because he had no income. Joanne's objections were summarily rejected by the trial justice with little or no findings, conclusions or legal analysis. Joanne remained without support.

Thereafter, the case came back before this Court with respect to issues of equitable distribution. Again, we issued a directive to the trial justice concerning his handling of this proceeding and his failure to finally decide the case. Our order of February 4, 2004 said, in relevant part:

"The Family Court justice assigned to this matter is directed to immediately hear and decide all the outstanding issues in this case and to reach a final conclusion and enter an order concerning [the] same, and to hear no other cases of any kind whatsoever until this case is finally resolved."

The trial justice entered a series of orders between February 13, 2004, and February 23, 2004, that purportedly resolved all remaining contested claims. An appeal was filed on February 23, 2004. Although we agreed to expedite the appeal, final judgment had not entered. We remanded this case and ordered the parties to present this Court with a final judgment from which a proper appeal could be taken. Several months later, the trial justice entered a document entitled "Amended Judgment" that, in violation of Rule 54 of the Family Court Rules of Procedure for Domestic Relations, contained a recital of

the pleadings and the record of proceedings in the Family Court from January 2, 2003, until June 1, 2004. This document also reflected—again incorrectly—that "a Final Judgment of divorce was entered" on April 4, 2003.

The court awarded Joanne 60 percent and Norman 40 percent of the net marital assets consisting of "the net equity received as a result of the sale of the business property" and the family home. Joanne was awarded "non-modifiable rehabilitative alimony" of $700 per week for a period of two years [8] and "a two percent (2%) interest in the net equity in any and all businesses, [limited liability corporations], partnerships or other entities" owned by Norman "as of the date of the entry of the Final Judgment, to wit: April 1, 2003." The division of tangible property, ranging from the china and silver from the dining room (twelve pieces each) to custody of Jose the parrot (to Joanne, with the right of first refusal to Norman) and the assignment of marital debt also were decided by the trial justice in the course of contentious and acrimonious hearings.

Before this Court, Joanne alleges that the trial justice, committed manifest error at several stages of the trial. These assignments of error also include allegations that the trial justice was biased in favor of Norman and lacked the requisite impartiality to fairly decide this case.

### Standard of Review

■ The Supreme Court "will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless he or she has 'misconceived the relevant evidence or was otherwise clearly wrong.'" *Koutroumanos v. Tzeremes,* 865 A.2d 1091, 1097 (R.I.2005) (quoting *Stephenson v. Stephenson,* 811 A.2d 1138, 1141 (R.I. 2002)). Consequently, "unless it is shown

---

**8.** Payments were not to begin until the com- mercial property had been sold.

that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's findings." *Id.*

## Analysis

## I

## Determination and Assignment of Marital Assets

Joanne contends that the trial justice abused his discretion when he first determined the extent and value of the marital estate and then distributed the assets between the parties. According to Joanne, the trial justice overlooked substantial evidence of other marital property, as well as Norman's routine practice of dissipating the marital estate. Joanne further alleges that the trial justice failed to make sufficient findings of fact concerning the ultimate distribution of marital property. We agree with these contentions.

■ "It is well [settled] that the equitable distribution of property is a three step process." *Koutroumanos*, 865 A.2d at 1096 (citing *Olivieri v. Olivieri*, 760 A.2d 1246, 1248 (R.I.2000)). First, the trial jus-

tice must identify which assets are marital property, then consider the factors set forth in G.L.1956 § 15–5–16.1(a),[9] and lastly, distribute the property in accordance with those findings. *Koutroumanos*, 865 A.2d at 1096 (citing *Olivieri*, 760 A.2d at 1248). This analytical process must faithfully be followed by the trial justice to ensure that the distribution of property is equitable, given the unique circumstances of each case. We have serious doubt about the trial justice's allegiance to this mandate.

The record in this case is replete with examples of Norman's accumulation and dissipation of substantial assets that seemingly went unchecked by the trial justice and ultimately were unaccounted for in the "Amended Judgment" of June 1, 2004. However, given the level of acrimony between the parties and their counsel and the limited marital assets remaining, an exhaustive accounting of Norman's misdealing and an audit of his financial misbehavior would serve no purpose save to incur additional expense and cause further delay. We shall highlight some of the most glaring abuse that was further compounded by an ill-conceived, so-called bi-

9. General Laws 1956 § 15–5–16.1(a), provides:

"Assignment of property.—(a) In addition to or in lieu of an order to pay spousal support made pursuant to a complaint for divorce, the court may assign to either the husband or wife a portion of the estate of the other. In determining the nature and value of the property, if any, to be assigned, the court after hearing the witnesses, if any, of each party shall consider the following:
(1) The length of the marriage;
(2) The conduct of the parties during the marriage;
(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
(4) The contribution and services of either party as a homemaker;
(5) The health and age of the parties;
(6) The amount and sources of income of each of the parties;
(7) The occupation and employability of each of the parties;
(8) The opportunity of each party for future acquisition of capital assets and income;
(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
(12) Any factor which the court shall expressly find to be just and proper."

furcated proceeding, and we shall direct the entry of a new judgment in accordance with this decision.

### a. Business Assets and Debt

It is apparent from the record, despite Norman's often evasive testimony that he commingled money from various business accounts and treated this money as his own personal expense account. When asked whether he received regular cash disbursements from his companies, Norman said, "[w]hatever we needed we would take—write a check and pay the bills. I would give Joanne money out of it, and some of it was spending money." Further, when asked about the source of money that he infused into one of his then-defunct businesses, Norman responded, "Money comes from different places. I can't answer that. It goes back and forth from one company to another. It could have been * * * I took a check from another company as a repayment of a loan or shareholders account or whatever came into that."

█ Although, the trial justice properly acknowledged Norman's businesses as a marital asset, he awarded Joanne only a 2 percent interest in the net equity in those ventures "as of the date of the entry of the Final Judgment, to wit: April 1, 2003." For the reasons that follow, we deem this to be a clear abuse of discretion.

█ The record discloses that on February 17, 2004, after appropriately considering the statutory factors enumerated in § 15-5-16.1, the trial justice declared that

the percentage division of the marital assets should be on a 60/40 basis in favor of Joanne.[10] Yet, two days later, on February 19, 2004, without reference to the statute or any real analysis or findings of fact, the trial justice arbitrarily assigned Joanne a 2 percent interest in the businesses that were or should have been declared marital assets. Although this Court does not require particularity in the lower court's decision, we do require that findings be made in accordance with § 15-5-16.1. "As long as this Court is able to review a lower court's decision and to determine therefrom that all the necessary facts and statutory factors were considered, we shall not require that court to explain its considerations in a particular or a single [prescribed] manner." *DiOrio v. DiOrio*, 751 A.2d 747, 753 (R.I.2000) (quoting *Gervais v. Gervais*, 688 A.2d 1303, 1308 (R.I.1997)).

The trial justice failed to explain why the assignment of the business property should be vastly different than the one he made two days before, which purportedly covered all the marital assets.[11] This is especially troubling given the manner in which Norman's business assets were exploited by the parties during the course of the marriage. Excluding Norman's businesses from the marital estate at this point resulted in a completely arbitrary limitation on the pool of marital assets.

Further, despite assigning Joanne only a 2 percent interest in Norman's businesses, the trial justice declared Joanne responsible, in certain instances, for 60 percent of the business debt. For example, Norman

---

10. The trial justice indicated that the primary reason for the disparity in the distribution of assets was attributed to Norman's infidelity.

11. The hearing justice's only commentary concerning this assignment of property addressed the financial wherewithal of Norman's then-existing businesses. The trial jus-

tice noted that most of Norman's businesses either were closed or in substantial debt. This alone would not justify the assignment ultimately made given Joanne's continued interest in Norman's business concerns and given Norman's ability to start further businesses before the entry of final judgment.

refinanced the mortgage on the marital domicile in 2002, after the divorce proceedings began, by incorporating a line of credit with an existing balance of $236,000, secured by the marital domicile. Norman testified that he frequently used this line of credit for business purposes. Because this debt was satisfied from the proceeds generated by the sale of the home, Joanne paid the lion's share.

Moreover, a judgment was entered against Cardinale Enterprises in the United States District Court, for the wrongful conversion of $216,000. The transaction giving rise to this judgment was made after the parties separated. Despite recognizing that the converted money was deposited into business accounts, the trial justice considered the judgment to be marital debt. The trial justice's reasoning was flawed:

> "I've heard enough. That's my decision, that it cannot be traced and went into the business account and, as far as I'm concerned, it was used for business purposes or for personal purposes unless it's shown otherwise."

Lastly, the final judgment in this case was entered by the Family Court on June 1, 2004, not April 1, 2003, the date that the divorce purportedly became final. As we shall elucidate, a bifurcated divorce procedure was inappropriate under these circumstances and allowed Norman to stonewall the discovery process and ultimately frustrate the timely and equitable distribution of the marital estate. Therefore, Joanne's interest in Norman's businesses should not arbitrarily be limited to the date of the "final decree" of divorce when issues concerning equitable distribution were not resolved until more than a year later, on June 1, 2004.

### b. Other Marital Property

 Joanne contends that the trial justice failed to appropriately value and distribute additional marital property, including two motorcycles and Norman's life insurance policies. According to Joanne, the trial justice grossly under-valued the motorcycles and overlooked the life insurance policies.

The record shows that the trial justice assigned a value of $200 to Norman's two custom motorcycles. In making this arbitrary valuation, the trial justice pointed to Joanne's failure to have the property appraised. Joanne contends that the two motorcycles were worth in excess of $30,000 and points to record evidence demonstrating at the very least that they were worth more than the $200 assigned value.[12] For example, after he and Joanne separated, Norman acquired one of the motorcycles for $5,640, plus the value of a trade-in motorcycle. The trial justice overlooked this evidence and faulted Joanne for failing to produce an eleventh-hour appraisal to rebut his arbitrary assignment of value.

The trial justice proceeded in a similar fashion with respect to Norman's life insurance policies. Norman's Statement of Assets and Liabilities clearly reflected these life insurance policies, and Norman also admitted that he owned them. However, when this was brought to his attention, the trial justice told Joanne to "get the transcript" if she wanted to have the policies included in the distribution. The trial justice's decision to disregard this evidence was arbitrary and a clear abuse of discretion. *See DiOrio,* 751 A.2d at 753.

### c. Post Separation Personal Expenses

Norman admitted, on the record, to various post-separation personal expenses; those expenses included spending approxi-

---

**12.** This evidence consisted of asset disclosure statements submitted by defendant.

mately $20,000 on his mistress, buying diamond jewelry, taking vacations, and making a $4,608.15 down payment on a timeshare apartment. Additionally, evidence disclosed that he bought a new motorcycle and opened an Ameritrade account with $15,000;[13] he paid $33,500 in closing costs to the lender that financed his purchase of the Middletown commercial property; and he loaned $36,500 to American Technologies, a company owned by a friend. He later purchased that company out of receivership for $30,000. Further, Norman spent more than $48,000 on oriental rugs and furnishings for a house he rented on Ocean Drive in Newport. This evidence was overlooked or misconceived by the trial justice. *See DiOrio*, 751 A.2d at 753. For example, although the trial justice found that money had been wasted and was probably gone, he declared that Joanne had no recourse or remedy:

"Supposed he used [the Bindley Western money] to go to the Mohegan Sun and blow it [sic] on a roulette table, suppose he did that, what does that do for me today? Am I supposed to say that he's a bad guy and he shouldn't have done that[?] How am I supposed to give her money if it's gone?"

When Joanne's counsel suggested that she be given a credit against the proceeds held by the Master, the trial justice summarily rejected this request. We deem this an abuse of discretion.

## II

### Child Support and Alimony Award

#### a. Temporary Orders

Joanne contends that child support and spousal support payments were terminated

or modified repeatedly throughout this proceeding without the benefit of a hearing and in violation of our statutory requirements. We agree.

An award of child support is primarily governed by § 15–5–16.2(a) which provides in relevant part that,

"the court shall order either or both parents owing a duty of support to a child to pay an amount based upon a formula and guidelines adopted by an administrative order of the family court."

■ The Family Court adopted its support guidelines in October 1987, and it has revised them on occasion, by administrative order. According to the terms of the administrative order, the support guidelines worksheet is equally applicable to temporary and final orders for child support. We consistently have held that § 15–5–16.2, in conjunction with the support guidelines, requires the trial justice to review the worksheet to determine the base level of child support that the noncustodial parent is required to pay. *Hogan v. Hogan*, 822 A.2d 925, 927 (R.I.2003) (citing *Lembo v. Lembo*, 677 A.2d 414, 418 (R.I. 1996)). Only if the trial justice finds that the recommended child support order would be inequitable to the child or either parent may he or she deviate from the calculated amount. *Id.; see also* 15–5–16.2. A party seeking a reduction in child support must present evidence showing a change in circumstances—"either an abatement of the needs of [the] children or an impairment of [the] financial ability to provide for those needs." *Heatherton v. Heatherton*, 110 R.I. 144, 146, 290 A.2d 912, 913–14 (1972).

---

**13.** In papers filed with this Court, Joanne alleged that documents produced by Ameritrade, after the trial had ended, showed that this account had $104,832.24 in reportable income for 2002.

■ According to Joanne, when the parties separated in April 2001, Norman began paying $800 per week in child support and spousal support.[14] The record discloses that during a contentious hearing on December 16, 2002, the trial justice entered an order prepared by Norman's counsel that entirely suspended Norman's support obligations. This order was entered without notice and without a showing of any change in circumstances.[15] Although the trial justice failed to make any ruling on this issue and may not have read the order, Joanne's support payments were eliminated.

■ Joanne moved to vacate the order, arguing that a motion to modify was not before the court and that Norman failed to produce any evidence showing a change in circumstances. The trial justice arbitrarily reestablished a support payment of $400 per week, without any evidence or reference to the support guidelines. This new order was then signed by a different Family Court justice.

Our review of the record discloses that the trial justice failed during the initial hearing on December 16, 2002, to make findings of fact concerning Norman's ability to pay and further compounded this error when he reinstated half the amount again without the benefit of any evidence or even a passing reference to the support guidelines. The trial justice found that by reducing the support to $400, he was simply giving both parties relief. The trial justice said that:

"I am entering a temporary order for $400.

" * * *

"Rather than $800, that gives [Norman] some relief and that will still give [Joanne] some money that will be used for the support of these children."

Norman's support obligations were again suspended on October 22, 2003.[16] Finding that Norman had no source of income, the trial justice determined that support payments would be suspended until Norman began earning income, but that Joanne could seek review of that decision. Joanne sought reconsideration on December 5, 2003, and the court denied her motion without explanation. Joanne again moved for reconsideration in May 2004, citing, *inter alia*, Norman's financial ability to buy the marital home and the commercial property for a combined amount of $2,351,500. A hearing never was held, an order for temporary support never was reinstituted, and Joanne has been without support since then. In our view, this was an abuse of discretion.

### b. Alimony

Joanne alleges that the trial justice's award of alimony, like the award of child

---

14. As far as we can tell from the record, a court order never was entered at the outset of the divorce proceeding directing Norman to make these support payments, but all parties operated as if there had been an order, and subsequent court orders recognized Norman's duty to make the $800 support payment. Consistent with our holdings in *Shepherd v. Shepherd*, 586 A.2d 1092, 1093–94 (R.I.1991) and *Carter v. Dworkin*, 561 A.2d 389, 390–91 (R.I.1989), we deem the order to have been entered because the parties acted in accordance with the requirements of the order and the payment obligation ultimately was set down in writing several times.

15. *After* the trial justice entered this order in open court, Norman orally moved to modify his support obligation based on counsel's contention that if support was terminated "until this case is ready for trial, then counsel will be ready for trial when we come back again."

16. Neither party made reference to this order in the papers filed with this Court, nor did they bring it to our attention during oral argument.

support, was arbitrary and erroneous. The trial justice issued an order on February 17, 2004, awarding Joanne rehabilitative alimony in the amount of $700 per week.[17] In what was an all-too-frequent occurrence, the award was not accompanied by any reasoning or rationale, as required by 15–5–16. In fact, our review of the record discloses that the trial justice was not prepared to make a decision on the issue of alimony during that particular hearing. The judge said at one point,

"I am not going to make a ruling on alimony at this time until both pieces of property are sold at this point and I see what Mr. Cardinale ends up with and what Mrs. Cardinale ends up with. Then I will make a decision with respect to alimony; until then, that's up in the air. And I will make a ruling on that once the properties are sold."

After Joanne's counsel informed the trial justice that an appeal could not be taken from his ruling until all issues had been addressed, as ordered by this Court, the trial justice said,

"All right. I am going to make a decision right now. Mr. Cardinale is to pay Mrs. Cardinale as rehabilitative alimony non-modifiable the amount of $700.00 a week for a period of two years."

The foregoing represents the full extent of the trial justice's consideration of the issue of alimony; its insufficiency is glaringly obvious. We are mindful that the trial justice had relieved Norman of all support obligations because of his alleged inability to pay and there was no temporary support order in effect. Joanne was left with no alimony or support whatsoever. Yet, with no factual findings, the trial justice summarily awarded $700 per week

in alimony for two years. The award clearly violates 15–5–16.1(c), which mandates that, "[t]he assignment of property, if any, to be made *shall precede the award of alimony,* since the needs of each party will be affected by the assignment of property * * *." (Emphasis added.)

## III

### Remedy

█ In light of our acquaintance with this divorce proceeding and the fact that we have the complete record before us, we decline to remand this case for a recalculation of equitable distribution of the marital assets or alimony. The level of rancor between the parties and counsel and the unfortunate posture taken by the trial justice have prompted us to direct the remedy in this case. Although we seldom deem it necessary to resort to our inherent supervisory powers to fashion remedies, we have done so on occasion to end seemingly interminable litigation. This case presents us with such a controversy. *See Lancellotti v. Lancellotti,* 543 A.2d 680, 682 (R.I. 1988); *Cheetham v. Cheetham,* 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979). "[W]e have all the necessary information available to us such that we may use our inherent power to apply tenets of justice and fairness to the factual findings of the [trial] justice, and fashion an appropriate remedy." *Tanner v. Town Council of East Greenwich,* 880 A.2d 784, 801 (R.I. 2005).

As we have observed, the pool of marital assets remaining after four years of litigation has been diminished substantially by this acrimonious proceeding and Norman's slipshod and evasive business practices.

---

**17.** No provision for "child support" was contained in the final judgment. Allegations were contained in the record that the minor child was then living with Norman, but nothing in the record altered the interlocutory decision pending entry of final judgment that placed the minor child with Joanne.

During oral argument, the Master disclosed that he was holding approximately $380,000 from the sale of the commercial property and the marital home. At the request of the Master, we issued an order on September 30, 2005, permitting him to pay any capital gains taxes from this money. Any other money held by the Master shall be divided in accordance with the equitable distribution ordered by the trial justice, 60 percent to Joanne and 40 percent to Norman. However, we direct that Norman's share shall be transferred to Joanne as partial payment of money owed to her as a result of this decision.

### a. Alimony and Child Support

With respect to alimony and child support, we conclude that Norman shall be responsible for retroactive support payments of $800 per week for the period from December 16, 2002, to October 22, 2003, and from May 1, 2004, to the date of this decision. For those weeks, if any, that Norman paid $400 in support, he shall be credited with that amount and be responsible for the difference. Concerning Norman's prospective alimony obligation, we affirm the trial justice's two-year time period, but increase the amount to $800 per week. The only thing clear from the record concerning child support and alimony payments is that Norman initially was paying Joanne $800 per week. This obligation was arbitrarily adjusted by the trial justice on more than one occasion without evidence or an adequate opportunity to be heard and in the absence of proper consideration of the support guidelines. *See Hogan,* 822 A.2d at 927 (citing *Lembo,* 677 A.2d at 418); *see also* 15–5–16.2. Accordingly, there is nothing in the record to suggest why the original $800 per week should not be maintained for the duration of Norman's support obligation.

### b. Capital Gains Taxes

On September 30, 2005, after oral argument in this case, we issued an order directing the Master to pay all capital gains taxes stemming from the sale of the commercial property and marital home to Norman. These taxes were estimated to be $225,000. Although the trial justice found that the tax liability was marital debt, we advised the parties that the liability for the capital gains taxes would be determined by this Court after full consideration of this appeal. In the interest of fairness and justice, we conclude that Norman shall be entirely responsible for the capital gains taxes generated by his purchase of the two properties.

■■■ Although a trial justice's "decision to take into account tax [consequences] applicable to a property distribution is committed to his or her sound discretion," *Koutroumanos,* 865 A.2d at 1100 (quoting *DiOrio,* 751 A.2d at 752), when the allocation of marital assets is arbitrary, not supported by proper findings of fact and is inequitable, this Court will decline to accord it deference. Thus, we vacate that portion of the judgment that purports to determine that the capital gains taxes were marital debt. We direct that Norman shall be responsible for all capital gains taxes resulting from his acquisition of the real properties. Any taxes paid by the Master from the money held, in accordance with previous orders of this Court, shall be Norman's responsibility. Norman shall reimburse Joanne for 60 percent of tax payments or liabilities.

### c. Business Expenses and Business Debts

In addition to declaring Norman responsible for the capital gains taxes, we hold that some of the payments by the Master are business expenses and business debts. The trial justice's summary allocation of

these payments as marital debt was arbitrary and clearly wrong. Further, because Joanne was awarded 2 percent of the corporate assets, her liability for business debt is likewise set at 2 percent. We direct that Norman reimburse Joanne for 98 percent of the money paid for the so-called Bindley Western conversion, and the $236,000 line of credit secured by the marital domicile that was used for business purposes. Moreover, a final judgment was not entered in this case until June 1, 2004; therefore, that part of the judgment declaring that Joanne has a 2 percent interest in Norman's business concerns until April 4, 2003, is vacated. Joanne's 2 percent interest shall continue until the final judgment was entered, June 1, 2004.

### d. Other Marital Property

We also address the valuation of the motorcycles at $200 by the trial justice and deem this to be an abuse of discretion. The record discloses that marital money was expended to purchase these vehicles. Although Joanne did not provide an appraisal, the evidence produced at trial established a value far in excess of $200. We direct that the motorcycles be sold and the proceeds divided in accordance with the percentage distribution ordered by the trial justice. Likewise, we direct that Norman's life insurance policies be surrendered and the proceeds derived from their cash value or any unearned premium be divided in accordance with the percentage distribution.

### IV

### Allegations of Bias and Prejudice of the Trial Justice

In her brief to this Court Joanne has alleged that the conduct and comments of the trial justice suggest bias that would lead a reasonable person to question his impartiality. This was not a simple case,

and its difficulty was greatly compounded by the fact that counsel were antagonistic and caustic toward each other and the parties. Although we do not undertake this discussion lightly, the level of acrimony contained in this record requires our review. The lack of civility between counsel in this case is regrettable and inappropriate. It was the responsibility of the trial justice to control the proceedings and counsel. He failed to do so.

Moreover, the trial justice's comments about the numerous orders issued by this Court were inappropriate, if not petulant. The plaintiff has alleged that "[h]er decision to seek instructions from this Court had an immediate impact on the trial judge's attitude, much like throwing gas on a fire." The record discloses that even in the final stages of this saga, the parties were fighting over every item of personalty acquired during the marriage, including—consistent with this state's rich history—a license plate from Joanne's uncle. When the trial justice summarily decided to accept Norman's testimony about who owned the plate, the following colloquy occurred:

"Joanne: It was my plate, Your Honor, on my car.

"The Court: Oh, you're finally speaking up.

"Joanne: When it comes to this plate, it's very important to me. It was my uncle who was like my father. It means nothing to him. This is purely revenge. And I want that plate of [sic] anything.

"The Court: I find it hard to believe that revenge is involved in this lawsuit.

"Joanne: I have no revenge here. All I want is fairness. That plate is very special to me, and he knows that, and that's the only reason he wants that plate. And I think this is a travesty, that he would keep that. And my moth-

er cries everyday and she's 83, your honor.

"The Court: She cries because she doesn't have that plate?·

"Joanne: Yes, she does.

"The Court: For God's sake, give her the plate and stop this 80–year old woman from crying over a plate.

**"( [Joanne] Leaving Courtroom)**

"The Court: Mrs. Cardinale, get right back here and sit down.

"Joanne: I am going to vomit.

"The Court: Then vomit and come back.

**"( [Joanne] Leaves Courtroom)**

"The Court: [The] [c]ourt notes that whenever Mrs. Cardinale is not happy with the decisions of this court, she suddenly gets sick.

"Now, what else do you have, [counsel]?"

This commentary by a judicial officer is improper and suggests a preconceived or settled opinion against a litigant, such that the trial justice should be excused from further responsibilities in this case. *Cavanagh v. Cavanagh*, 118 R.I. 608, 621, 375 A.2d 911, 917 (1977) (citing *State v. Buckley*, 104 R.I. 317, 322, 244 A.2d 254, 257 (1968)).[18]

## V

### Bifurcation and Final Judgment

In light of the tortured travel of this proceeding, we take this opportunity to comment on the manner in which this divorce was granted. There is no provision in the Rules of Procedure for a "bifurcated divorce." Although an appeal from the decision pending entry of final judgment

does not stay the final decree of divorce, our jurisprudence anticipates that all the issues in a divorce will be adjudicated in a single proceeding. Any exceptions to this requirement must be accomplished through Rule 54(b) of the Family Court Rules of Procedure for Domestic Relations that provides for the entry of judgment upon some, but not all, claims for relief:

"Judgment—Costs.—

" * * *

"(b) *Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or when multiple parties are involved, *the court may direct the entry of a final judgment as to one or more but fewer than all the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.* In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer that all the parties *shall not terminate the action as to any of the claims or parties,* and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." (Emphases added.)

Compliance with Rule 54 is mandatory—a final judgment must resolve all the issues pending before the trial court or the court must direct a judgment in accordance with Rule 54(b).

---

18. While we are of the opinion that the trial justice did not conduct himself with the demeanor that we expect from a judicial officer, our correction of his rulings pursuant to our inherent power to craft a remedy, means that the parties were not ultimately deprived of their due process.

We contrast this case, in which a final decree of divorce purportedly was entered without adjudication of the remaining issues, from a case in which an appeal is taken from a decision pending entry of final judgment. In the latter case, a party to a divorce may appeal an interlocutory decision or a decision pending entry of final judgment. The divorce is not stayed pending an appeal on issues other than the divorce itself. *Koziol v. Koziol,* 720 A.2d 230, 232 (R.I.1998). In that situation, a Family Court justice may enter a final divorce decree even though other portions of the decision, such as equitable distribution or alimony contained in the decision pending entry of final judgment, remain on appeal. *Id.* (citing *Centazzo v. Centazzo,* 556 A.2d 560, 563 (R.I.1989)). Critically, in this circumstance all the claims have been adjudicated and are contained within the decision pending entry of final judgment. The law does not require that a final decree of divorce be stayed until all appeals are resolved. *Id.* That does not mean, however, that a final decree of divorce can be entered without a decision by the trial justice on the remaining issues. Nor may the parties agree otherwise.

█ Thus, in the absence of a Rule 54(b) determination of "no just reason for delay" and "an express direction for the entry of judgment" by the trial court, a so-called "bifurcated proceeding" does not result in a final decree of divorce; the case remains pending until all the issues have been decided. Unless the court directs the entry of a Rule 54(b) judgment, the designation of a decree as a "final judgment" is a nullity; the divorce is not final, the case is not disposed and remains pending in the Family Court. There is no other procedural vehicle by which the parties can obtain a "quickie" divorce and leave the remaining, contentious issues for another day.

Rule 1.17 of the Family Court Rules of Practice provides:

**"Interchangeability of terms-Final decree-Final judgment-Interlocutory decree-Interlocutory judgment.**—In actions granting a divorce an interlocutory judgment may be denominated 'Interlocutory Decree' and a final judgment may be denominated "Final Decree.' *In all other instances, the term 'Judgment' shall be used to denominate the document which evidences the act of the court finally adjudicating the rights of parties to the action."* (Emphasis added.)

This rule of practice is consistent with Rule 54(b) and anticipates that a final judgment adjudicates all of the claims between the parties. *See DiBattista v. State,* 808 A.2d 1081, 1087 n. 5 (R.I.2002) (Rule 54 provides that a judgment "includes a decree and any order from which an appeal lies.").

In the case at bar, the trial justice failed to appreciate that the so-called "final judgment" that ostensibly granted an absolute divorce in April 2003 was not a final judgment. After this Court remanded the case for the entry of final judgment, the trial justice declared:

"How many [final judgments] are there? Well if there are two, tell me why the Supreme Court[,] after you went up there[,] came back and said enter a final judgment?"

When counsel for Joanne attempted to explain (correctly) that in a bifurcated proceeding, a final judgment was required on all the issues, the trial justice responded, "Well, it's no wonder these people are broke after that logic."

This confusion was compounded by the entry of a document entitled "Amended Judgment" that was nothing more than a narration of the proceedings and a recita-

tion of the various rulings made during the course of this seemingly interminable venture. This was a contested divorce trial, not a series of motions and orders, and a final judgment should have been entered in accordance with the rules.

 This Court previously has declared that the practice of bifurcated divorce actions should not be undertaken when the parties have not complied with discovery. *Koutroumanos*, 865 A.2d at 1094 n. 2. We now unequivocally declare that (except in extraordinary cases and then only with respect to issues of child support, custody, visitation and relocation) all the issues between the parties shall be adjudicated in a single proceeding. The decision shall be embodied in a decision pending entry of final judgment, followed by a final judgment entered in accordance with the Rules of Procedure. Whenever fewer than all issues are decided, the trial justice shall set forth on the record his or her reasons for adjudicating fewer than all the claims between the parties and direct the entry of judgment in accordance with Rule 54(b).

 Finally, in the absence of extraordinary circumstances accompanied by specific findings of the trial justice, this Court will not entertain an appeal from a so-called bifurcated divorce proceeding.

### Conclusion

For the reasons set forth herein, we sustain the appeal, vacate the judgment and direct the entry of a new judgment consistent with our decision and in accordance with Rule 54. We direct that any further proceeding in the Family Court be assigned to a different trial justice. The judgment shall be amended as follows:

1. The parties are granted an absolute divorce *nunc pro tunc* to April 4, 2003.

2. The plaintiff is awarded 60 percent of the marital assets, and the defendant is awarded the remaining 40 percent.

3. The plaintiff is awarded 2 percent of the businesses, partnerships and other entities owned or sold by the defendant as of the date of the final judgment, June 1, 2004. The value of these enterprises shall be determined by a neutral arbitrator, and the defendant shall reimburse the plaintiff for her share of all earnings and profits of these businesses.

4. All money ordered held by the Master in accordance with this Court's order of February 4, 2004, shall be divided between the parties in accordance with the percentage division of marital assets; however, the defendant's share shall be paid over to the plaintiff as partial reimbursement in accordance with this decision.

5. All capital gains taxes shall be the responsibility of the defendant. The defendant shall reimburse the plaintiff for her percentage share of any payment made by the Master for capital gains taxes.

6. The so-called Bindley Western judgment for conversion of $216,000 and any associated expenses in connection with that judgment, including attorneys' fees, is declared to be a business debt. The defendant shall reimburse the plaintiff 98 percent of these payments.

7. The refinancing of the marital domicile after the parties separated, including a business line of credit, shall be allocated as business debt of $236,000. The defendant shall reimburse the plaintiff 98 percent of that amount.

8. The plaintiff shall have a lien against the former marital domicile, the commercial property and all other property owned, in whole or in part, by the defendant as security for satisfaction of the judgment.

9. The motorcycles shall be sold and the proceeds divided in accordance with the division of marital assets.

10. The life insurance policies on Norman's life shall be surrendered and the cash value of the policies divided in accordance with the division of marital assets or the defendant shall pay the plaintiff her share of the cash value of the policies.

11. The defendant shall reimburse the plaintiff $800 per week for support for every week from December 16, 2002, to October 22, 2003, and from May 1, 2004, until the date of this decision. The defendant shall be given a credit for any payments made up to $800 per week.

12. Alimony of $800 per week shall be payable for two years, beginning on the date of this decision.

13. The defendant shall reimburse the plaintiff for her reasonable attorneys' fees; the amount to be determined by the Family Court in accordance with our jurisprudence.

The papers in this case shall be remanded to the Family Court.

Justice SUTTELL did not participate.