**Supreme Court**

No. 2013-236-Appeal.
(N07-8)

Anne duPont Corbin        :

          v.              :

Richard Beverley Corbin, III.    :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Anne duPont Corbin          :

v.                          :

Richard Beverley Corbin, III.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  This case came before the Supreme Court on appeal by the defendant, Richard Beverley Corbin, III (Bev), from an order of the Family Court on two post-final-judgment motions filed by the plaintiff, Anne duPont Corbin.[1]  The defendant contends that the trial justice erred when she determined that the post-employment compensation that he received from his employer was marital property and therefore her award of 50 percent of it to Anne was also error.  Alternatively, the defendant maintains that, should this Court affirm the trial justice's findings with regard to the post-employment compensation, then in that case the fee that he paid to an attorney for negotiating that compensation should be considered marital debt, of which Anne should pay half.  Additionally, the defendant argues that the trial justice erred when she awarded counsel fees to Anne for her prosecution of a motion to modify child support, after she made a specific finding that the defendant did not adequately notify Anne when he regained employment.  For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

---

[1] To avoid confusion, we will refer to the parties by their first names.  No disrespect is intended.

# I

## Facts and Travel

The parties were married on September 27, 1997. Two children and a decade later, Anne filed for divorce. While divorce proceedings progressed, the parties pursued settlement negotiations that resulted in the signing of a property settlement agreement (PSA)[2] on January 9, 2009. The PSA was incorporated by reference, but not merged, into the Family Court final judgment dated April 9, 2009. Thereafter, both parties filed several post-judgment motions, two of which are the subject of this appeal. After numerous hearings on the various motions were conducted over an extended period of time, the trial justice issued her decision on April 16, 2013, and entered her final order on February 17, 2014. In her seventy-page decision, among other grants and denials, the trial justice granted Anne's motion to modify child support, awarded her counsel fees, and granted her motion to compel specific performance and/or to adjudge Bev in contempt regarding paragraph 7(E) of the PSA, awarding Anne 50 percent of the $138,937.29[3] amount Bev received from his former employer, Wells Fargo, upon his termination.

## PSA Negotiations

In December 2008, while Bev was bargaining with his employer, he also was negotiating the terms and conditions of a PSA with Anne. On December 30, 2008, after Anne's counsel provided Bev's divorce counsel with a draft PSA, Bev's divorce counsel responded, proposing various changes. Significantly, counsel proposed a change to paragraph 7(E) explaining:

---

[2] The parties often refer to this agreement as the marriage settlement agreement, i.e., the MSA. For purposes of accuracy and consistency, we shall refer to this agreement as the property settlement agreement, i.e., the PSA.

[3] This was the sum after deductions for taxes.

"This paragraph was not discussed and is unacceptable; as you are aware, <u>Kirk v. Kirk</u> has specifically excluded from division in a divorce the recovery of damages for future earnings which exceed the duration of the marriage; any claim which Bev may receive (which is apparently highly speculative at this point) is in lieu of future earnings, and will be counted as income for child support purposes but is not divisible as a marital asset. This is distinguishable from the economic benefits earned by Anne at Square Mile, all of which were earned during the marriage, but are deferred in terms of payment. Therefore, subparagraph (e) should be excluded."

Paragraph 7(E) of the final PSA, which was executed on January 9, 2009, articulated:

"E. **Husband's Wells Fargo Claim.** The Husband has a claim against his prior employer, Wells Fargo. In the event the claim is settled and the Husband receives any settlement sum as a result of said claim, for any work performed by him for Wells Fargo prior to the entry of the Final Judgment of Divorce in this matter, the Husband shall pay to the Wife forty (40%) percent of the settlement, net any taxes and litigation expenses."

Additionally, paragraph 10(A) declared, "[a]t such time as the Husband obtains employment, he shall notify the Wife and the parties shall calculate the appropriate child support sum based upon the parties' then respective incomes and the Child Support Guidelines and visitation travel expenses."

### Bev's Employment with Wells Fargo

In June 2006, Bev entered into a two-year agreement as an at-will employee with Acordia RE, Inc., a division of Wells Fargo, with a start date of July 17, 2006, and an annual salary of $175,000. In addition, he signed a two year nonsolicitation agreement with Acordia. A week later, he signed another document; this one contained a one-year nonsolicitation clause.[4]

---

[4] Paragraph VIII of the subsequent agreement articulated that "[t]his Agreement supersedes any prior written or verbal agreements pertaining to the subject matter herein." Effectively, this statement nullified the prior two year noncompete agreement.

By June 2008 problems began to develop between Bev and Wells Fargo, and as of July 2008, his initial two year employment agreement with Acordia was over. By this time, Bev had engaged the services of an employment attorney to advise him on his rights as an employee.

In August 2008 Bev was assigned to work under a new supervisor in another Wells Fargo affiliate. Bev testified that his new supervisor was very hostile to him and made it clear to him that his job was in jeopardy due to his poor performance. Despite those admonitions, Bev received an offer of continued employment in a letter dated August 19, 2008. Nonetheless, conversations regarding the offer of continued employment did not go very well and by September 2008, the parties were unable to come to any sort of agreement as to Bev's continued employment at Wells Fargo. Consequently, Bev engaged in the Wells Fargo dispute resolution process.

To begin that process, Bev sent an email to a Wells Fargo department head on September 17, 2008, requesting a review of his performance and inquiry of the department head about his "fair compensation" for, significantly, 2007 and 2008. In a follow-up email sent to a Wells Fargo human resources employee on September 26, 2008, Bev maintained that he was seeking to be compensated "fairly" for his work. Shortly thereafter, Bev was placed on administrative leave with pay. About a month later, Bev was terminated via a phone call received from the human resources department.

Bev then emailed another Wells Fargo human resources employee, again inquiring about the dispute resolution process determination of his compensation for 2007 and 2008. In her response, the human resources employee indicated that the results of the dispute resolution process had already been communicated on the telephone to him, that the inquiry did not substantiate his claims, and that he had been paid what was owed to him in compensation for

- 4 -

2007 and 2008. Shortly thereafter, the same human resources employee sent Bev a copy of a departure agreement and release of claims. As part of the agreement, Bev would receive the sum of $175,000.

Bev testified that his main concern with the departure agreement was how many nonsolicitation agreements would be incorporated as part of the departure agreement. He maintained that one nonsolicitation agreement provided for a one-year term while another provided for two years. He claimed that he was concerned because the firm, in return for his promise not to compete against it for two years, would be compensating him with only one year's salary.

In response to the receipt of the departure agreement, Bev's employment attorney sent Wells Fargo's senior counsel a letter on December 22, 2008. The letter summarized Bev's tumultuous discharge from Wells Fargo and demanded that Wells Fargo provide Bev with the opportunity to understand the departure agreement. If not provided with that opportunity, then Bev would have "no choice but to bring suit for the full amount he is owed." The senior counsel sent Bev's employment attorney a response letter rejecting his claims and extending the deadline for the execution of the departure agreement until January 16, 2009. Through counsel, Bev later corresponded that he was "willing to resolve this matter on terms very similar to those that Wells Fargo ha[d] proposed." Attached to the email were suggested changes to paragraphs 4(a), 9, and 10 of the departure agreement.

On January 21, 2009, after the amount to be paid to Bev in the departure agreement had been negotiated from $175,000 to $218,000, and after it was specified that the one-year nonsolicitation agreement would be incorporated, Bev signed the departure agreement. On February 4, 2009, Wells Fargo sent Bev's employment attorney the fully executed departure

agreement, along with a check in the amount of $138,937.29. The check and the departure agreement were mailed by the attorney to Bev on March 4, 2009. Bev testified that he did not deposit the check when he received it because he "did not know what [he] wanted to do with the money at the time" and that "[a]ll the banks * * * were failing." It is significant, however, that between January 2009 and May 2009, he did deposit a considerable sum of money, $175,000, in his bank account. Those funds came from Anne, who remitted that sum representing his share of the proceeds derived from the sale of their home.

### Bev's Employment with EquiSales Associates

In April 2009, Bev began working for EquiSales. He received his first paycheck from that company the following month. Anne contended that Bev failed to inform her of his securing new employment, but Bev testified that Anne had received adequate notice of his new employment through the report of the guardian ad litem, through the children's therapist, and through his own divorce counsel. Specifically, the guardian ad litem's report indicated that "[d]efendant informed the [g]uardian that he was now working for a consulting company * * *."

### Family Court Decision

After several days and many hours of hearings, the Family Court rendered its decision in April 2013. In her seventy-page decision, the trial justice made a number of findings of fact. Significantly, the trial justice found that Bev

> "believed that he was entitled to additional compensation for work performed during 2007 and 2008; [Bev's] Post Final Judgment protests that his dispute with Wells Fargo was not about compensation [was] not credible; Wells Fargo's offer to settle the employment dispute was for a lump sum of $175,000 and a complete Departure Agreement and not for compensation for future earnings."

By finding that the lump sum of $175,000 was not for compensation for future earnings, the trial justice dispelled Bev's heavy reliance on Kirk v. Kirk, 577 A.2d 976 (R.I. 1990). Indeed, she indicated that the court's "result [was actually] consistent with the Supreme Court's holding in Kirk."

Furthermore, the trial justice found that Bev, "his divorce attorney[,] and his employment attorney were in contact prior to the execution of the [P]SA regarding the relationship between the Departure Agreement and divorce issues." Although she had found that all parties on Bev's side had been well informed, the trial justice concluded that Bev's divorce attorney had not advised Anne's attorney that Bev had indeed received a settlement offer prior to the divorce trial. She said, "[t]here is a limit to what can be considered sharp and shrewd lawyering, especially during negotiations leading to a [property] settlement agreement. In this case, the limit has been exceeded and pushed too far." With that said, the trial justice held "that the concerted contrivance of language to avoid [p]laintiff's claim to equitable distribution [was] a distorted and contrived breach of * * * [d]efendant's fiduciary duty."

With respect to Anne's motion to modify child support, the trial justice ruled that "[i]n the [P]SA it [was] clear that the parties had agreed that when [Bev] obtained new employment he would notify [Anne] so they could calculate the appropriate child support in accordance with the Child Support Guidelines based on their increased income." She added "that no other person was named as an intermediary to advise [Anne] of [Bev's] employment."

Moreover, when Bev was asked when he gave notice to Anne of his new employment, he dodged the question by responding, "[T]hat was done in the process in April when I met with [the guardian ad litem] and [the children's therapist]." The trial justice found "that the so-called 'process' [was] not proper or adequate notice to [Anne] that [Bev] was employed." Accordingly,

the trial justice granted both of Anne's motions. Significantly, in her order, the trial justice specified that Bev was "entitled to a credit of $22,211.25 for his litigation expenses for negotiating the settlement." However, she concluded that "given the sharp dealing and trickery of prior counsel and [Bev], [Bev] shall not profit therefrom and shall be solely responsible for said expense." After final judgment was entered, Bev timely appealed.

## II

### Standard of Review

It is well established that this Court "will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless he or she has misconceived the relevant evidence or was otherwise clearly wrong." Palin v. Palin, 41 A.3d 248, 253 (R.I. 2012) (quoting Cardinale v. Cardinale, 889 A.2d 210, 217 (R.I. 2006)). Accordingly, "[U]nless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's findings." Id. (quoting Cardinale, 889 A.2d at 217-18). Nevertheless, "[q]uestions of law in an appeal from the Family Court * * * are reviewed de novo." Id. (citing Curry v. Curry, 987 A.2d 233, 238 (R.I. 2010)).

## III

### Analysis

On appeal, Bev argues that the trial justice erred when she determined that his post-employment compensation was marital property. He contends that, under prevailing law, the post-employment compensation was nonmarital because Wells Fargo paid it to him as future compensation. Alternatively, Bev maintains that, should this Court affirm the trial justice's findings, then in that event, the attorney fee that he incurred for negotiating the departure agreement should be considered marital debt, of which Anne should pay half. Additionally, Bev

- 8 -

claims that the trial justice erred when she awarded counsel fees to Anne for his failure to notify her of his new job because she received timely notice of his new position from the guardian <u>ad litem</u>.

## The Post-Employment Compensation

Black's Law Dictionary defines "severance pay" as "[m]oney (apart from back wages or salary) that an employer pays to a dismissed employee." Black's Law Dictionary 1583 (10th ed. 2014). The definition includes that "[t]he payment may be made in exchange for a release of any claims that the employee might have against the employer." <u>Id.</u> Here, based on the trial justice's extensive review of the record, as evidenced by her lengthy decision, she made a finding of fact that the amount Wells Fargo paid Bev was to settle his claims for compensation for 2007 and 2008, i.e., "back wages," and not for future payments. Because the trial justice found the amount paid to be for compensation from 2007 and 2008, she determined that it was not severance pay.

It is undisputed that Bev was an at-will employee at Wells Fargo. Because no reason is required to terminate an at-will employee, an employer has no obligation to pay an at-will employee severance pay if the parties have not created a valid contractual provision for it. <u>See</u> <u>D'Oliveira v. Rare Hospitality International, Inc.</u>, 840 A.2d 538, 541 (R.I. 2004) ("[W]e are satisfied that the plaintiff has failed to provide any evidence to establish that [the employer] intended to promise or be bound by an offer to provide severance * * *."). After reviewing the record, we are satisfied that it is indeed silent about the presence of any Wells Fargo severance policy with respect to Bev's at-will employment with the company.

Furthermore, it is significant to us that the trial justice, after hearing Bev's testimony and reviewing the documentary evidence, concluded that his testimony was not credible. Weighing a witness's credibility is within the province of the trial justice. <u>See</u> <u>Zaino v. Zaino</u>, 818 A.2d 630,

638 (R.I. 2003) ("We will not disturb a trial justice's * * * credibility determinations unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong.").

Nonetheless, Bev has consistently argued that "a review of the documentary evidence in its entirety show[ed] that [his] separation pay under the departure agreement was precisely that – traditional severance pay which was to serve as a salary substitute for Bev while he searched for a new job and was subject to the one year noncompete clause." In his brief, Bev cited to numerous cases from other jurisdictions holding that severance pay was nonmarital property. However, the trial justice's extensive review of the documentary evidence led her to conclude that the post-employment compensation was not severance pay. As a result of the trial justice's finding that this amount was not severance pay, we need not, and shall not, address whether severance pay is marital property or not, as it is superfluous to our analysis of this appeal. Therefore, we need not discuss the myriad cases cited to in Bev's brief. After a thorough review of the record, we cannot say that the trial justice overlooked the evidence or was otherwise clearly wrong, and we perceive no error in the trial justice's reasoning.

Because we are affirming the trial justice's finding that the amount Bev received was marital property, we must briefly address Bev's alternate argument that the attorney fees he paid for negotiating the departure agreement should be considered marital debt, and that Anne should pay half of it. We do not agree. Although not addressed in any detail in her decision, the trial justice did conclude that Bev should have been "entitled to a credit of $22,211.25 for his litigation expenses for negotiating the settlement." However, the trial justice also pointed out that, "given the sharp dealing and trickery of prior counsel and [Bev], [Bev] shall not profit therefrom and shall be solely responsible for said expense." In other words, she correctly considered the amount expended to secure the settlement to be a marital debt but nonetheless

deemed Bev to be undeserving of reimbursement. Given the finding of the trial justice in this case, and her credibility determination, we perceive no error in the trial justice's decision to withhold the credit claimed by Bev.

## The Award of Counsel Fees

Lastly, it is well settled that "[t]he Family Courts have jurisdiction to award attorney's fees with respect to petitions for divorce." Centazzo v. Centazzo, 556 A.2d 560, 562 (R.I. 1989) (citing G.L. 1956 § 8-10-3 and G.L. 1956 § 15-5-16). "A trial justice is vested with discretion in determining the need for and amount of counsel fees. Unless such discretion is abused, the trial justice's decision will not be disturbed." Id. (citing Smith v. Smith, 88 R.I. 17, 21-22, 143 A.2d 309, 312 (1958)). Here, Bev argued that Anne had received adequate notice of his new employment through the report of the guardian ad litem, through the children's therapist, and through his own divorce counsel. However, the trial justice found the PSA to be clear in "that the parties had agreed that when [Bev] obtained new employment he would notify [Anne] so they could calculate the appropriate child support * * *." Furthermore, the trial justice indicated that, when Bev "was directly asked when he gave notice to [Anne] of his new employment, he evaded answering by stating, 'that was done in the process in April when I met with [the guardian ad litem] and [the children's therapist].'" She found that this "so-called 'process'" was not adequate notice to Anne. After considering the record and the arguments raised by the parties, we hold that the trial justice was not clearly wrong, nor did she overlook or misconceive the evidence, when she held that the PSA required Bev to notify his wife personally and directly when he obtained new employment and that he failed to do so. Thus, we will not disturb the decision of the trial justice.

**IV**

**Conclusion**

For the foregoing reasons, the defendant's appeal is denied and the order appealed from is affirmed. The papers in this case are remanded to the Family Court.

SUPREME COURT – CLERK'S OFFICE

OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Anne duPont Corbin v. Richard Beverley Corbin, III. |
| **Case Number** | No. 2013-236-Appeal.<br>(N07-8) |
| **Date Opinion Filed** | January 31, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Newport County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Haiganush R. Bedrosian |
| **Attorney(s) on Appeal** | For Plaintiff :<br><br>Robert S. Parker, Esq. |
| | For Defendant:<br><br>Lauren E. Jones, Esq.<br>Robert S. Thurston, Esq. |