**Supreme Court**

No. 2010-409-Appeal.
No. 2011-337-Appeal.
(P 07-637)

Gail M. Bober                    :

v.                          :

David R. Bober.               :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2010-409-Appeal.
No. 2011-337-Appeal.
(P 07-637)

Gail M. Bober            :

v.                     :

David R. Bober.          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** In this contested and at times acrimonious divorce action, both parties find grist for the appellate mill in the trial justice's comprehensive decision dissolving their twenty-four-year marriage. The defendant, David R. Bober, appeals from the decision pending entry of final judgment on the grounds that: (1) the trial justice overlooked or misconceived the medical evidence relating to the plaintiff's medical condition; (2) the trial justice erred by awarding alimony to the plaintiff that could "turn into 'lifetime' alimony"; (3) the trial justice overlooked or misconceived evidence in arriving at the property distribution award; and (4) the trial justice erred by retroactively applying a modification of child support in violation of G.L. 1956 § 15-5-16.2.

The plaintiff, Gail M. Bober, cross-appeals, arguing that the trial justice erred by failing to award her: (1) attorney's fees; (2) a sixty-percent share of the equity in a house defendant's mother transferred to defendant and his sister; and (3) lifelong medical coverage. Further, she contends that the trial justice's "sua sponte amended alimony award" is inequitable to her and contrary to previous holdings of this Court. For the reasons set forth in this opinion, we affirm in

part and reverse in part the decision pending entry of final judgment entered by the Family Court.

## I

### Facts and Procedural History

The plaintiff and defendant were married on June 22, 1985. They had one child, a daughter, born February 14, 1994. On March 16, 2007, plaintiff filed a complaint for divorce; defendant filed an answer asking that the complaint be dismissed, as well as a counterclaim for divorce. A trial commenced on December 1, 2008. On the fourth day of trial, the trial justice, having heard testimony from two neurologists concerning the symptoms that plaintiff was experiencing caused by multiple sclerosis (MS) and having observed plaintiff on the witness stand, appointed a guardian ad litem (GAL) to assess whether plaintiff "ha[d] the capacity to continue on with this trial, to understand proposals said to her, to comprehend proposals." On February 10, 2009, the GAL reported that plaintiff was "able to proceed fully and competently" subject to a recommended daily time limitation of three hours to plaintiff's testimony.[1] Trial resumed on March 6, 2009, and testimony concluded on March 11, 2009.

After multiple motions and continuances, the trial justice filed a seventy-page written decision on March 30, 2010. The decision summarized the medical testimony regarding plaintiff's diagnosis of MS and reviewed the parties' assets, income, and expenses. The trial justice then ordered defendant to pay child support in the amount of $850 per month, including an adjustment for the difference between that amount and the amount previously paid by defendant as temporary support, retroactive to June 1, 2009. The trial justice ordered defendant

---

[1] The GAL also recommended that "subject to the rules of evidence, [plaintiff] be allowed to use any notes she has prepared in order to refresh her recollection" and recommended that the trial justice consider holding the trial in chambers, an invitation the trial justice declined.

to pay alimony to plaintiff in the amount of $250 per week, terminating upon the death of plaintiff or defendant, plaintiff's remarriage, or upon the retirement of both plaintiff and defendant. Finally, the trial justice performed an equitable distribution of the marital assets, awarding sixty percent to plaintiff and forty percent to defendant of all marital assets, save for the parties' respective "pension/retirement plans"; those he awarded fifty percent to each party by means of Qualified Domestic Relations Orders (QDRO).

After the trial justice issued his decision, at least three hearings were held on motions for clarification of the decision. At one such proceeding on April 21, 2010, the trial justice noted that plaintiff would continue to receive the benefit of defendant's medical coverage under his retirement plan. There was further discussion regarding one bank account (the "Orion" account), which defendant alleged was a premarital asset and plaintiff argued was a marital asset. The trial justice directed the parties to refer to the exhibits in order to determine the date the account was opened.

At a hearing on June 17, 2010, after engaging in a colloquy regarding the termination of alimony, the trial justice amended his decision to allow for the termination of alimony upon defendant's retirement date, irrespective of whether plaintiff is retired. The trial justice ruled that, upon defendant's retirement, alimony would cease and plaintiff would receive fifty percent of defendant's pension. Also on June 17, 2010, defendant argued that plaintiff's withdrawal of $6,000 had not been accounted for in the court's distribution of marital assets. The defendant again argued that the Orion account was not a marital asset, and the trial justice granted a brief adjournment in order for counsel for both parties to find an exhibit that would establish when the account was opened. Upon returning to the court, plaintiff's counsel represented that there was no such exhibit in evidence.

- 3 -

Further hearings were held on July 20, July 22, and August 3, 2010, during which the trial justice went through most of the provisions in the proposed decision pending entry of final judgment. On August 3, 2010, the trial justice entered the decision with the following provisions pertinent to this appeal: (1) alimony is to terminate on the earliest occurrence of plaintiff's death or remarriage, or defendant's death or retirement; (2) plaintiff was awarded sixty percent of the Orion account, with the remaining forty percent to the defendant; (3) defendant was awarded all right, title, interest, and liability in the house he shared with his mother; (4) defendant is to pay child support of $850 per month, retroactive to June 1, 2009, with a lump sum payment of $2,077.05 representing the difference between the award of $850 per month and the previous child support order of $150 per week for the period of June 1, 2009 to April 1, 2010.

A final hearing on an outstanding motion, not pertinent to this appeal, was conducted on August 12, 2010. At that time, the trial justice made a minor correction to the order and signed and dated the amendment. The defendant filed a notice of appeal on August 27, 2010, and plaintiff cross-appealed on August 30, 2010.[2] Final judgment was entered on September 27, 2011. Additional facts will be supplied as necessary.

## II

### Standard of Review

This Court "will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless he or she has misconceived the relevant evidence or was otherwise clearly wrong." Palin v. Palin, 41 A.3d 248, 253 (R.I. 2012) (quoting Cardinale v. Cardinale, 889 A.2d 210, 217 (R.I. 2006)). "Consequently, unless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the

---

[2] The cases were consolidated for briefing and argument.

- 4 -

trial justice's findings." Id. (quoting Cardinale, 889 A.2d at 217-18). "Questions of law in an appeal from the Family Court, however, are reviewed de novo." Id.

**III**

**Discussion**

On appeal, defendant argues that the trial justice overlooked or misconceived the medical evidence relating to plaintiff's medical condition. Further, defendant asserts that the alimony award was erroneous because it could "turn into 'lifetime' alimony" because the termination of alimony is linked to defendant's retirement rather than the retirement of both parties. The defendant also argues that the trial justice overlooked or misconceived the expenses of both parties in making the award of alimony. Additionally, defendant challenges the property distribution, contending that the trial justice failed to consider plaintiff's dissipation of the marital assets, failed to account for plaintiff's unilateral withdrawal of marital funds, and overlooked evidence that the Orion account was a premarital asset. Finally, defendant argues that the trial justice erred by retroactively applying a modification of child support in violation of § 15-5-16.2.

In her cross-appeal, plaintiff argues that the trial justice erred by failing to award her attorney's fees and a sixty-percent share of the equity in a house that defendant's mother transferred to defendant and his sister. Further, plaintiff asserts that the trial justice erred by failing to award her lifelong medical coverage.

**A. Medical Evidence**

The trial justice dedicated eleven pages of his decision to a summary of the testimony regarding plaintiff's diagnosis of MS. The plaintiff's treating physician, Dr. Salvatore Napoli, testified that plaintiff suffered from "a form of [MS]" that has caused her "some mild to

moderate cognitive issues" including "difficulties with multitasking [and] processing information." Doctor Napoli testified that plaintiff's illness falls within the "relapsing/remitting" category of MS and that she will require some form of treatment for the remainder of her life. According to Dr. Napoli, plaintiff is presently treating her MS with a medication that costs approximately $10,000 per month, but he stated that the copay for the medication is likely around $40-$60 per month. Doctor Napoli testified that, in his opinion, plaintiff is not able to work full-time, but that she could work part-time; he stated that he would consider thirty hours per week to be part-time. Finally, Dr. Napoli noted that he could not make a prediction about plaintiff's prognosis because "[t]hat's the tricky part of this disease. You can't make a prediction about it, about where it can go."

The defendant's expert, Dr. Elaine Jones, agreed that plaintiff has the relapsing/remitting category of MS. Doctor Jones characterized the relapsing/remitting form of MS as the type with the most favorable prognosis. However, Dr. Jones admitted that there are no generally accepted tests that can accurately "predict" the prognosis of patients with MS.

In his decision, the trial justice stated that "[Dr. Napoli]'s opinion is that the plaintiff has primary progressive Multiple Sclerosis." That is a misstatement; the experts were in accord that plaintiff has relapsing/remitting MS. The defendant argues that the trial justice misconceived the evidence of plaintiff's diagnosis and thus concluded that she had the form of MS with the least favorable prognosis, leading him to base his property distribution and alimony award on a fundamental error. Although we agree that the characterization of plaintiff's expert's opinion was an error, in order to conclude that this error is "fundamental," we would need to disregard the totality of the trial justice's analysis. Not only did the trial justice exhaustively and accurately recount the experts' testimony concerning both the manifestations of plaintiff's illness

and the effects of her disability, but also, in the text leading up to the mischaracterization of her

diagnosis, the trial justice correctly stated:

> "Based upon reasonable medical certainty, [Dr. Napoli] was of the opinion that the current stage in [plaintiff's] disease of Multiple Sclerosis is 'the relapsing category.' There is a new area of inflammation. He feels that she is in remission but that there are hidden things going on which may not be detectable in a relapse. He has prescribed Copaxon therapy for her gait instability. There are daily injections to prevent inflammation. With respect to his prognosis, the doctor testified that this is the tricky part of the disease as you cannot make predictions."

In determining the alimony award, the trial justice found that "plaintiff has a need for

supplemental income and that the [d]efendant has the capacity to pay supplemental income in the

nature of spousal support/alimony." The trial justice noted that plaintiff's need for support was

due to her working on a part-time basis, and he stated that "[h]er reason has been set forth in

detail by this [c]ourt in its analysis of the [p]laintiff's health condition and her diagnosis of

multiple sclerosis." Notably, the seventy-page decision contains multiple references to MS and

several references to relapsing/remitting; the term "primary progressive" appears but once.

It is apparent to us that the trial justice based his decision on the uncontradicted medical

testimony that plaintiff suffers from MS and is capable of working part-time, and that there is no

way to "predict" her prognosis. The mischaracterization of plaintiff's diagnosis in one sentence

was an unfortunate error, but it was not the basis of the trial justice's decision.[3]

---

[3] We note that, at the April 21, 2010 hearing, when the parties sought clarification of the trial justice's decision, defense counsel inquired about this issue, stating somewhat obliquely, "I don't recall seeing a specific finding by your Honor to include language that, quote, the [c]ourt found that her medical condition was permanent in nature." The trial justice stated twice that he "never used the word 'permanent,'" explaining that for both the equitable distribution and alimony award he referred back to his lengthy discussion of plaintiff's diagnosis of MS, including testimony that "if she follows the right regimen and takes the right medication she should be able to lead a fruitful life."

## B.  Child Support

The defendant contends that the trial justice's retroactive application of child support was a modification in violation of § 15-5-16.2(c)(2).[4]  On January 28, 2008, a consent order was entered awarding temporary weekly child support of $150 to plaintiff.  This order was made "without prejudice to the rights of either party to contest the amount of the child support at the time of the trial on the merits."  On October 16, 2009, plaintiff filed a motion for modification of the child support award.  No hearing was held on the motion for modification.  In his decision in 2010, the trial justice made findings of fact and awarded child support of $850 per month, or $197.67 per week, retroactive to June 1, 2009.[5]  The defendant argues that, pursuant to § 15-5-16.2(c)(2), the 2010 child support order could only be made retroactive to October 16, 2009.

At a hearing on January 8, 2010, the trial justice made clear that he was not acting on any motion, stating that "[t]here is no motion for modification. * * * This is a hearing de novo as to what is needed.  You never really had a real hearing on the [child support of] 150."  The trial justice noted that, although the trial had concluded, he had not made an order on child support, saying:

> "yes, you've given me some stipulations.  Stipulations don't go to the essence * * * of the issues * * * I wanted to get evidence in to show what her needs are.  * * * That's what I'm doing here in this hearing, getting financial data up to date, because it's changed from the trial, because the house has been sold."

---

[4] General Laws 1956 § 15-5-16.2(c)(2) states in pertinent part:
> "After a decree for support has been entered, the court may from time to time upon the petition of either party review and alter its decree relative to the amount of support and the payment of it, and may make any decree relative to it which it might have made in the original suit.  The decree may be made retroactive in the court's discretion only to the date that notice of a petition to modify was given to the adverse party * * * ."

[5] This date is immediately subsequent to the parties' submission of posttrial memoranda, including a Child Support Guideline.

Although there had been an agreed temporary child support award, no Child Support Guidelines Worksheet had been submitted and considered until just before June 1, 2009. "General Laws 1956 § 15-5-16.2(a) provides that the Family Court 'shall order either or both parents owing a duty of support to a child to pay an amount based upon a formula and guidelines adopted by an administrative order of the family court.'" Waters v. Magee, 877 A.2d 658, 665 (R.I. 2005). Therefore, at the January 8, 2010 hearing, the trial justice was considering the award for the first time and, as he made clear, he was not acting on any motion for modification. We hold that it was not an abuse of discretion to award child support retroactive to June 1, 2009, rather than to the date that plaintiff filed a motion for modification.

### C. Medical Coverage

In her cross-appeal, plaintiff argues that the trial justice erred in not awarding her "lifelong health coverage." The trial justice held that defendant was to maintain plaintiff on his medical insurance plans; upon defendant's retirement, he noted, plaintiff would continue to be covered under defendant's retirement plan. The plaintiff argues that, due to her MS diagnosis, she is "irreparably vulnerable" if her medical coverage is terminated by defendant's remarriage or "subsequent collective bargaining changes or political climate." In declining to make the health coverage award permanent, the trial justice noted that medical insurance is a form of alimony and, should plaintiff's health coverage be terminated, "[n]othing provided in * * * § 15-5-16[] shall affect the power of [the] [c]ourt as subsequently provided by law to alter, amend, or annul any order of alimony previously entered."

"While a Family Court justice has the discretion to enter an award of continuing health care coverage, * * * once such an award has been entered, [G.L. 1956] § 27-20.4-1 is triggered,

regardless of whether § 27-20.4-1 specifically has been referenced in the final judgment of divorce."[6] L'Heureux v. L'Heureux, 770 A.2d 854, 856 (R.I. 2001). We have stated that:

> "The clear and unambiguous language of § 27–20.4–1 requires that health insurance benefits, when provided for in a final decree of divorce, continue at no cost to the former spouse of the party participating in the plan as long as the plan participant is still a member of the plan and until (1) either party remarries, or (2) a time provided by the judgment of divorce. Furthermore, the continuation of the original plan coverage shall cease when the former spouse becomes eligible to participate in a comparable health plan through his or her own employment." L'Heureux, 770 A.2d at 857.

Given the dictates of § 27-20.4-1, it would appear that the only avenue open to plaintiff, should her medical coverage cease, would be to seek a modification of alimony. Even were we to, as plaintiff asks, "specifically state that she has a need for lifelong health insurance" and that "she is not foreclosed from seeking health coverage (or additional alimony to cover the cost thereof)," the effect would be no different—plaintiff would still need to seek a modification of her alimony award. Accordingly, it was not error for the trial justice to decline to award lifelong medical coverage.

### D. Equitable Assignment of Property

The defendant argues that the property distribution was erroneous because the trial justice erred by: (1) failing to consider plaintiff's dissipation of the marital assets; (2) failing to credit

---

[6] General Laws 1956 § 27-20.4-1(a) states in pertinent part:
> "[T]he person who was the spouse of the party prior to the entry of judgment for divorce may remain eligible for continuing benefits * * * as long as the original member is a participant in the plan * * * and until either one of the following shall take place: (1) the remarriage of either party to the divorce, or (2) until a time as provided by the judgment for divorce."
Further, "[i]f the person who was the spouse * * * becomes eligible to participate in a comparable plan * * * through his or her own employment, the continuation of the original plan coverage shall cease." Section 27-20.4-1(a).

- 10 -

defendant for monies he paid towards marital debt; (3) failing to consider that plaintiff unilaterally withdrew funds and used the marital line of credit to pay her attorney's fees; (4) overlooking evidence that the Orion account was premarital property; and (5) failing to include the value of the marital furnishings in the sixty/forty equitable distribution equation.

## 1. Dissipation of Marital Assets

The defendant asserts that plaintiff dissipated marital assets by not responding to a would-be buyer's offer of $300,000 for the marital domicile. Because the house eventually sold for $279,000, defendant argues that plaintiff's "stonewalling tactics" cost the marital estate $21,000. The house had been listed at a price agreed to by the parties of $354,900. The plaintiff asserts that this lapse was due to both parties' complete inability to communicate, and she notes that, when a later offer was made on the house, defendant counter-offered at $317,000. It seems clear that whatever loss may have been realized on the sale of the house was due to the lamentable and all-too-typical acrimony that accompanies a divorce, rather than any willful dissipation of assets. The defendant also asserts that plaintiff's refusal to file joint income tax returns in 2008 resulted in a loss to the marital estate, because she received a refund of $2,066, whereas he owed $4,481. However, plaintiff acted within her rights in electing to file separately, and again, the loss suffered is part of the sad cost of a contentious divorce, not a willful dissipation of the marital estate.

## 2. Payments Made From Marital Assets

The defendant next argues that the trial justice erred by overlooking evidence that plaintiff paid her attorney's fees out of the marital line of credit and by not crediting defendant for the $40,851 he paid towards marital expenses, as well as the $6,000 unilateral withdrawal that plaintiff made prior to filing for divorce. Specifically, defendant takes issue with the trial

- 11 -

justice's decision to split sixty/forty the $74,694.96 that <u>defendant</u> withdrew unilaterally from the marital accounts, without first subtracting those sums.

In his decision, the trial justice addressed this issue, stating:

> "The [c]ourt has already noted that the defendant has removed assets that are marital assets from the marital estate. However, the [c]ourt, in fashioning a remedy, has available sufficient assets to take care of this improper act on the part of the defendant. Likewise, the plaintiff has removed some assets and has also imposed an equity loan upon the former marital domicile. The court will fashion an appropriate remedy so that both parties will not be adversely affected by the activities that each took unilaterally against the interests of the other.
> "The [c]ourt [o]rder of January 28, 2007 * * * is particularly significant, wherein the defendant was ordered not to pay child support from joint funds. '2. The payments to be made by [defendant] to [plaintiff] shall not be paid out of the parties' joint funds or those joint funds removed by [defendant] from the parties' joint accounts prior to or at the commencement of these divorce proceedings, but shall be paid from defendant's salary or his own funds.'"

The defendant admitted that, after discovering that plaintiff had withdrawn $6,000 (roughly sixty percent of the balance) from a marital account, he proceeded to withdraw a total of $74,694.96 from four marital accounts. In a court order dated June 27, 2007, defendant was ordered to "provide an accounting for the funds * * * he removed from the [p]arties['] joint account in March 2007 and further, the [d]efendant shall forthwith return all said funds to a joint account. Neither [p]arty shall access the said funds without an [o]rder of this [c]ourt." The defendant admitted that he never returned the funds, as ordered, and claimed that he spent the money on "marital bills and [his] attorney[']s fees."

The plaintiff argues that, as a result of defendant taking full control of the proceeds of the marital accounts, she was forced to use the marital line of credit to pay living expenses. We have no reason to believe that the trial justice overlooked any of the evidence of the parties' conduct

regarding the marital assets.  On the contrary, we are convinced that the trial justice considered all of the testimony and properly exercised his discretion in ordering a sixty/forty distribution of the $74,694.96 that defendant removed and retained for years, in contravention of a court order.

### 3.  Orion Account

The defendant next argues that the trial justice overlooked the "uncontradicted and reliable evidence" that the Orion account was premarital property.  Principally, defendant argues that because plaintiff listed the account as his premarital property in one of her exhibits, that exhibit constitutes an admission on her part that the account is his.  The trial justice, however, on several occasions requested the parties to submit an exhibit that would establish the date that the Orion account was opened.  In the absence of such evidence, it was not error for the trial justice to hold that the account was a marital asset, subject to equitable distribution.

### 4.  Household Furnishings

The defendant also argues that the trial justice erred by awarding the household furnishings to plaintiff without including their value in the equitable distribution equation.  The defendant mischaracterizes the trial justice's ruling.  The trial justice did not deny defendant a share in the household furnishings outright; rather, he ordered that "[i]f the parties have not divided the household furniture, furnishings and effects, formerly contained in the marital domicile, then all such items are awarded to the [p]laintiff."[7]   It is unclear from the record what effects, if any, defendant removed from the house prior to its sale.  Again, it was not error for the trial justice to award to plaintiff whatever furnishings had not been divided.

---

[7] It is worth noting that, at the time of the decision in August 2010, defendant had been out of the marital domicile for over three years, and the house had been sold the previous year.

### 5. Pawtucket Real Estate

In her cross-appeal, plaintiff argues that the trial justice erred in failing to award her a share in the equity value of the house that defendant shared with his sister. The trial justice found that defendant held a sixty-percent interest in real estate located in the City of Pawtucket, Rhode Island. He further found that this property had been transferred by defendant's mother to defendant and his sister in exchange for a promissory note in the amount of $275,000 plus interest and that it was neither a gift nor an inheritance but was a marital asset subject to equitable distribution. The defendant's mother testified that the note was enforceable by her estate; defendant testified that he had made no payments on the note. The trial justice awarded defendant his interest and liability in that property. The plaintiff argues that, because the property is part of the marital estate, she should receive sixty percent of the equity in the property. "[M]arital '[a]ssets are to be divided equitably, though not necessarily equally.'" Ruffel v. Ruffel, 900 A.2d 1178, 1193 (R.I. 2006) (quoting Perreault v. Perreault, 540 A.2d 27, 30 (R.I. 1988)). It is likely that there is very little equity in the Pawtucket property,[8] and it is subject to a $1-per-year lease to defendant's mother. We are convinced that the trial justice appropriately considered all the relevant factors and properly exercised his discretion in awarding defendant his interest and liability in the property.

### 6. Alimony Award and Pension Benefits

The one issue upon which both parties seem to agree, albeit for different reasons, is that the trial justice's sua sponte modification of his written decision concerning the termination of alimony was inequitable. In the original decision, one of the conditions terminating defendant's obligation to pay alimony was "[w]hen payments under all of the retirement plans (both Plaintiff

---

[8] There was no testimony regarding the fair market value of the Pawtucket house.

and Defendant) commence." The trial justice subsequently modified this provision such that alimony would terminate, inter alia, upon only defendant's retirement. Exhibits introduced at trial indicate retirement accounts in defendant's name, exclusive of his firefighters' pension and accrued vacation time, in the amount of approximately $101,000, and accounts in plaintiff's name in the amount of approximately $62,500.

The defendant argues that the trial justice erred as a matter of equity by modifying his original decision because it effectively awards plaintiff lifetime alimony. He contends that because his salary less the $250 weekly alimony payments "is so much more" than the one-half of the pension benefit that he would receive upon retiring, he "will not be able to afford to retire." Thus, he argues that equity compels that both parties' "pensions be in place for alimony to terminate."

The plaintiff finds inequity in the decision pending entry of final judgment for other reasons. She views defendant's pension as a marital asset subject to equitable distribution, yet an asset over which defendant has been given full control concerning the timing of such distribution. The uncontroverted evidence at trial was that defendant would be eligible to receive his maximum retirement benefit of sixty percent after completing twenty-three years and four months of service, a milestone that he has likely since passed. It is clearly conceivable, however, that defendant, who is now fifty-four years old, could continue to work for some time.[9]

The equitable distribution of a working spouse's pension, or its value, can be a vexing problem under the best of circumstances. A trial justice must balance one spouse's right to continue working against the other spouse's desire, or need, for immediate access to his or her

---

[9] At oral argument it was suggested that the mandatory retirement age for firefighters in the City of Pawtucket is sixty-five.

share of marital property. It is, however, a situation that we have had an opportunity to consider on several occasions.

The parties in Furia v. Furia came before this Court on two occasions; in Furia v. Furia, 638 A.2d 548, 553 (R.I. 1994) (Furia I), we held that the husband was entitled to collect his portion of the value of the wife's pension benefit and that he need not wait until she retires to receive those benefits because "the employee/spouse should not unilaterally deprive the nonemployee/spouse of his or her property * * * ." In Furia v. Furia, 692 A.2d 327, 328 (R.I. 1997) (Furia II), after the Family Court ordered the wife to pay the husband one-half of the value of the pension, in the form of a lump sum of $30,000 with a promissory note for the remainder, we held that it was inequitable to require the wife to pay out the value of the pension before or at the time of her retirement; rather, we held that the proper distribution was a monthly payment from the wife to the husband equal to one-half of the pension benefits that she would have received had she retired.

In Janson v. Janson, 773 A.2d 901, 903 (R.I. 2001), we interpreted a property settlement agreement that was silent as to the date when the wife would be entitled to receive her share of the husband's pension benefit. We held that, "in the absence of a clear agreement specifying how and when the husband's pension was to be valued and distributed to the wife, * * * it was inequitable for the trial justice to allow the husband to 'unilaterally deprive' the wife of her share of the pension by delaying his retirement" until some uncertain future date. Id. at 904.

Likewise, in Hagopian v. Hagopian, 960 A.2d 250, 252 (R.I. 2008), the husband was a police officer who was eligible for retirement after twenty years of service and who faced mandatory retirement after twenty-five years of service. The trial justice in that case ordered the husband to make monthly payments to his wife equal to the value of her share of his pension,

- 16 -

commencing on the date when he became eligible to retire. Id. The wife would then receive the actual pension benefits when the husband actually retired. Id. In affirming this decision, we stated that "[t]he trial justice observed the demeanor of the parties from the bench and detected such a high level of hostility" that to allow the husband to unilaterally control the distribution date of his pension benefits would allow the possibility of "a grave injustice." Id. at 253.

In the case under review, the trial justice initially conditioned the termination of alimony upon the eligibility of both parties to receive benefits under their retirement plans. He then explained his reasoning at the April 21, 2010 hearing on the motions for clarification, and he also exhorted the parties to negotiate a different resolution:

> "Now, the smartest thing, as I feel -- but this is not my decision -- for Mrs. Bober to do is to say, okay, if my husband retires, I want my portion of the pension because that's going to be more than the alimony. And from Mr. Bober's point of view, there is no more alimony.
> " * * *
> "I strongly feel, I think I made it clear two or three times today, * * * that because of the fact that the [d]efendant * * * has chosen not to retire, it's not for me to say to retire or not to retire, I feel it would benefit both parties if through counsel and the decision that the [d]efendant can only make if he chooses to retire, then it seems that at that particular point the parties could agree to end alimony and start getting benefits under the retirement plan because that would absolutely benefit both parties. It's a win-win situation. If for whatever reason they chose not to, that's their decision to make.
> " * * *
> "[I]f they choose not to do that, then she gets her alimony payment until all pensions are in a status that they can be drawn on.
> " * * *
> "My order says until both * * * pension plans are in a pay status or eligibility status is a better word to use, she gets her 250 * * * . But if they agree that he's going to retire, then you can draft an amendment to that so that alimony ends and he only has to share his pension with her and then she has to share -- unless you make a different agreement -- her pension with him when she's in a status that she can get it.
> " * * *

- 17 -

"So unless payment commences under all of the retirement plans of both [p]laintiff and [d]efendant, she continues getting alimony, but the alimony figure is less than what she would get if she got a straight payment from her 50 percent of his pension. But he hasn't retired yet, and I'm not going to force him to retire, and she's not eligible to get her payments yet. But if you make an amendment to it, * * * then what happens is, she starts getting 50 percent of his pension and she doesn't get alimony anymore, and the 50 percent turns out to be more than the $250 a week alimony. It's kind of a simple solution, but that's your decision to talk about. * * * But she continues to get alimony until all, hers and his, pension plans are, according to this, commenced.
" * * *
"[M]y intent is clear, for the record, she's not going to get ten cents of his pension while she is getting $250 a week alimony."

At the June 17, 2010 hearing, however, the trial justice modified the award, stating:

"There is one substantive issue that if you can't do it I'm going to sua sponte do it because I think all I've done is create more problems than the parties are entitled to, and that's with respect to the pensions.
" * * *
"I'm not changing anything about the 50/50. I'm not changing anything about QDROs. What I am changing is with relation to the alimony. As soon as Mr. retires or -- retires without waiting for Mrs. to have her pension plans in a pay status, then she will start getting his -- the 50 percent from his pension because it turns out to be more than $250 a week alimony and alimony ends."

In the context of this case, we are of the opinion that this aspect of the trial justice's decision is inequitable, and we deem it to be error insofar as it misconceives the nature of defendant's pension plan as a marital asset. Our case law makes clear that a pension is akin to a "forced savings account whose funds will become available to the parties upon retirement." Moran v. Moran, 612 A.2d 26, 33 (R.I. 1992) (quoting Stevenson v. Stevenson, 511 A.2d 961, 965 (R.I. 1986)). Pension benefits are thus marital property subject to equitable distribution. Id. We have also said that "one spouse should not be allowed to defeat the other spouse's interest in

an asset earned and accumulated during the marriage by invoking a condition wholly within his or her control." Allard v. Allard, 708 A.2d 554, 558 (R.I. 1998).

In Furia II, 692 A.2d at 328, we opined that "the proper distribution of plaintiff's pension is the payment each month by plaintiff to defendant of an amount equal to one-half of the monthly pension benefits that plaintiff would have received had she chosen to retire * * * ." In Janson, 773 A.2d at 904, we expanded upon that principle and held that "it was inequitable for the trial justice to allow the husband to 'unilaterally deprive' the wife of her share of the pension by delaying his retirement until some uncertain date in the future when he might decide to retire."

Here, the trial justice seemingly recognized that plaintiff's receipt of alimony in lieu of her interest in the firefighters' pension was not in her best interest, yet he failed to articulate the potential option of requiring defendant to pay to plaintiff her share of the pension benefits, either at the time of the divorce or upon defendant attaining full eligibility. Pension benefits are not in the nature of support; rather, they are marital property in which plaintiff was awarded a fifty-percent interest.

We are mindful of the vast discretion with which a trial justice is imbued in equitably distributing marital assets. This was clearly a bitterly contested and acrimonious divorce. Sadly, we see such cases from time to time, and they are all too frequent occurrences in Family Court. We note the following comment by the no doubt exasperated trial justice during testimony concerning payment of tuition for the parties' minor daughter:

> "You know, this case gets more disturbing every day. * * *
> What troubles me is this case has been going on so long, how you
> as attorneys and the parties did not split up at least a percentage of
> these assets. * * * [I]f you don't agree, I will make that decision,
> but how do you keep all of this money tied up, the kid could go to
> this school. No one is talking to each other. Obviously the

> lawyers aren't talking to each other [either] because some of this
> money would have gone for that child."

We commend the trial justice for his equanimity in presiding over, not only the lengthy trial, but also the plethora of pre- and posttrial motions.

One factor in the record, however, strikes us as unusual, disconcerting, and out of all proportion to the size of the marital estate or the complexities of the issues involved, and that is the enormity of the legal fees. We emphasize that the trial justice did not pass upon the reasonableness of the attorneys' fees; nor do we, other than to note that the record contains an attorney's lien that was filed on September 3, 2010 in excess of $239,000.

As these parties have clearly exhausted their funds waging this "War of the Roses," we shall not instruct the Family Court to conduct further proceedings consistent with this opinion. Rather, we invoke our own supervisory authority and direct that upon remand the Family Court enter an order directing defendant to pay to plaintiff one-half the value of his pension benefit at such time as he becomes eligible to receive his maximum pension benefit.[10] Such order shall be prospective from the date of this opinion, and not retroactive. Upon commencement of said payments, defendant's obligation to pay alimony shall cease. We affirm the decision pending entry of final judgment in all other respects.

In light of our holding in this opinion, the defendant's challenge to the award of alimony becomes moot. Finally, we affirm the trial justice's denial of the plaintiff's request for attorney's fees. In Family Court, "[a]n award of attorney's fees is not punitive in nature but serves to ensure that a spouse who lacks financial stability is still able to secure competent representation in the divorce proceeding." Thompson v. Thompson, 642 A.2d 1160, 1165 (R.I. 1994). We review a trial justice's decision whether to award attorney's fees under an abuse-of-discretion

---

[10] We understand defendant's maximum pension benefit to be sixty percent.

- 20 -

standard. See Ruffel, 900 A.2d at 1193. In this case, it is difficult to discern how either party can bear the burden of the legal fees to which they have become exposed. In any event, we are satisfied that the trial justice did not abuse his discretion in declining to award attorney's fees to the plaintiff.

## IV

## Conclusion

Our review of the record reveals that the trial justice took great pains to consider all of the evidence before him. We have no doubt that the parties, given the opportunity, would continue to challenge aspects of the decision indefinitely (or at least until both they and the marital estate are exhausted); but, with deference to the trial justice's discretion, and not a little admiration for his patience, we affirm in part and reverse in part the decree of the Family Court. The record shall be remanded to the Family Court. Upon remand, we direct the Family Court to enter an order directing the defendant to pay to the plaintiff one-half the value of his pension benefits at such time as he becomes eligible to receive his maximum pension benefits; such payments shall be made monthly. The defendant's obligation to pay alimony shall cease upon the commencement of such payments. Upon the defendant's retirement, the plaintiff shall receive one-half of the defendant's pension benefits pursuant to a qualified domestic relations order. The decision pending entry of final judgment is affirmed in all other respects. The record of this case shall be returned to the Family Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       Gail M. Bober v. David R. Bober.

**CASE NO:**               No. 2010-409-Appeal.
                          No. 2011-337-Appeal.
                          (P 07-637)

**COURT:**                 Supreme Court

**DATE OPINION FILED:**  June 6, 2014

**JUSTICES:**              Suttell, C.J., Goldberg, Flaherty**,** Robinson, and Indeglia, JJ.

**WRITTEN BY:**            Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Family Court

**JUDGE FROM LOWER COURT**:

                          Associate Justice Howard I. Lipsey

**ATTORNEYS ON APPEAL:**

                          For Plaintiff:  Colleen M. Crudele, Esq.

                          For Defendant:  Lauren E. Jones, Esq.