January 27, 2020

**Supreme Court**

No. 2018-217-Appeal.
(N 15-115)

Raymond T. Boschetto :

v. :

Cindy M. Boschetto. :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Raymond T. Boschetto      :

         v.               :

Cindy M. Boschetto.         :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The plaintiff, Raymond Ted Boschetto (Ted), appeals from an amended decision pending entry of final judgment terminating his marriage to the defendant, Cindy Boschetto (Cindy), on the grounds of irreconcilable differences.[1] On appeal, Ted challenges the trial justice's assignment of certain marital assets as well as her determination of the amount of his child support obligation. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

## I

### Facts and Travel

Ted and Cindy married in September 2007. The month before the wedding, they executed a premarital agreement in which they agreed, *inter alia*, that, in the event of termination of the

---

[1] We refer to the parties by their first names for clarity. In doing so, we intend no disrespect.

marriage, they would evenly divide all jointly-owned assets except for certain assets specifically identified in the agreement; they also agreed to waive alimony. Ted and Cindy have one daughter, born in November 2009.

In June 2015, Ted filed a complaint for divorce in the Newport County Family Court, citing irreconcilable differences that had caused the irremediable breakdown of the marriage as grounds therefor, and requesting joint custody of their daughter with physical placement assigned to him, alimony and child support awarded to him, and an equitable distribution of the marital assets. Cindy filed a counterclaim requesting sole custody of their daughter with reasonable visitation rights for Ted and permission to relocate to Massachusetts with their daughter. Cindy also sought child support, reimbursement for money borrowed by Ted during the marriage, and an equitable distribution of the marital assets.

A trial in the Family Court began in June 2016, with Cindy represented by counsel and Ted representing himself, *pro se*. The trial justice heard testimony from several witnesses, including Cindy, Ted, the two guardians *ad litem* assigned to represent their daughter's interest, and others.[2] Most of the testimony by Cindy and Ted recounted the rise and fall of their marriage, specifically testifying about their own—and each other's—employment schedules and work habits as well as the division of labor in raising their daughter, especially the ways in which they had handled, or mishandled, sharing the time with their daughter as they proceeded through the latter years of their marriage, their separation, and the pendency of their divorce proceedings. Most of the details of

---

[2] Ted ordered excerpts from the trial testimony but not full transcripts of the entire trial. As a result, we have reviewed only these excerpted portions of the trial testimony, in which Cindy and Ted were the only two witnesses to testify. There was reference in the excerpts from the trial testimony to several other witnesses, most of whom were not identified by name or relationship to the parties.

their testimonies are not relevant to the issues Ted raises on appeal, so we shall not recount them in unnecessary detail here.

However, to provide some salient context to the circumstances of the parties' divorce, there was no dispute that Cindy was the primary breadwinner throughout the marriage. Initially, she worked out of Boston, then from her home, also traveling frequently for work. For his part, Ted was self-employed, managing his own business.

Shortly before the parties filed for divorce, Ted signed a contract to purchase property in Middletown, which he intended as either an investment or a residence, using money from a joint account he held with Cindy for the initial deposit. Cindy testified that she had never been interested in acquiring this property with Ted, in part because she knew the marriage was over and in part because she did not want to continue living in Rhode Island. The real estate deal fell through, and the parties lost the $10,000 deposit. With respect to other spending, Cindy testified that she had withdrawn approximately $33,600 from her Morgan Stanley retirement investment accounts during the divorce proceedings to cover rental payments for multiple properties as well as to pay legal fees for both herself and Ted.

On September 26, 2016, the trial justice filed a written decision. She awarded the parties joint custody of their daughter, with primary placement awarded to Cindy. Their daughter would spend every other weekend and one weekday evening per week with Ted, with the opportunity for additional time during the summer and a set schedule for annual holidays. The trial justice ordered Ted to pay $250 per week to Cindy for child support, and the trial justice determined specific allocations of the parties' assets for equitable distribution.

Relevant to the issues on appeal, the trial justice found that Cindy commuted "five (5) plus hours" to Boston each day, while Ted "was doing martial arts and enjoying the Newport lifestyle,

which included what had long been a weekly routine—Thursday and Saturday nights out drinking." She further found that Ted "ha[d] no qualms about verbally abusing" Cindy in the presence of their child. The trial justice ordered that: (1) Ted and Cindy were to keep the rights and title to their individual bank accounts at BankNewport and Citizens Bank, respectively; (2) the parties' joint account at California Republic Bank was to be equitably divided after taking into account Ted's unilateral decision to withdraw $10,000 for the deposit on the Middletown property, to which Cindy had not agreed; (3) the contributions made to Cindy's 401K account by Cindy and her employer since the date of the marriage were to be equitably divided between the parties; (4) the appreciation of the value of Cindy's account with Morgan Stanley was to be subject to equitable distribution, and Cindy's unilateral decision to withdraw $33,600 from the account to cover costs of "prosecution of th[e] divorce * * * [would] not be added back into the value of the Morgan Stanley accounts"; and (5) Ted would pay Cindy $250 per week as child support.

An Amended Decision Pending Entry of Final Judgment entered in November 2016. Ted filed a timely notice of appeal. The final judgment granting Ted's complaint for divorce and Cindy's counterclaim for divorce entered on February 22, 2017.

## II

### Standard of Review

This Court "will not disturb findings of fact made by a trial justice or magistrate in a divorce action unless he or she has misconceived the relevant evidence or was otherwise clearly wrong." *Vieira v. Hussein-Vieira*, 150 A.3d 611, 615 (R.I. 2016) (quoting *Palin v. Palin*, 41 A.3d 248, 253 (R.I. 2012)). "Consequently, unless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof, this Court will not disturb the trial justice's

- 4 -

findings." *Id.* (quoting *Palin*, 41 A.3d at 253). "Questions of law in an appeal from the Family Court, however, are reviewed *de novo*." *Id.* at 615-16 (quoting *Palin*, 41 A.3d at 253).

"The justices of the Family Court are vested with broad discretion as they seek to fairly divide marital property between the parties in divorce proceedings." *Vieira*, 150 A.3d at 618 (quoting *Horton v. Horton*, 891 A.2d 885, 889 (R.I. 2006)). When a premarital agreement governs the distribution of property in the event of termination of the marriage, the rules of contract interpretation apply. *See Wright v. Zielinski*, 824 A.2d 494, 497, 497-98 n.2 (R.I. 2003) (the Family Court has jurisdiction to hear breach-of-premarital-contract claims). If any of the parties' property is not covered by the agreement, then the property is distributed equitably. "It is well established that the equitable distribution of property is a three-step process." *Vieira*, 150 A.3d at 618 (quoting *Koutroumanos v. Tzeremes*, 865 A.2d 1091, 1096 (R.I. 2005)). "The trial justice first must determine which assets are marital property, then must consider the factors set forth in § 15-5-16.1(a), and, finally, he or she must distribute the property." *Id.* at 619 (footnote omitted) (quoting *Koutroumanos*, 865 A.2d at 1096).

### III

### Discussion

Before us, Ted challenges several of the specific asset allocations as well as the amount of child support he was ordered to pay to Cindy as errors and abuses of the trial justice's discretion.

### A

### Investment Accounts

The parties' premarital agreement specified the way in which Cindy's investment accounts would be distributed if the marriage terminated. The relevant provision stated that "all future contributions to Cindy's investment accounts in excess of the amounts shown [in the agreement

as the value of the accounts at that time] shall be treated as if jointly owned by the parties" and divided equally between the parties in the event of termination of the marriage. The agreement listed two investment accounts for Cindy: a 401K account through her employer and an account with Morgan Stanley.

## 1

## 401K Account

The value of Cindy's 401K account at the time the parties executed the premarital agreement was $256,000. At the time of trial, the undisputed value of the 401K account was $629,400. The trial justice concluded that, pursuant to the premarital agreement, the sum of $158,950.05, which represented the total contributions to Cindy's 401K account made by Cindy and her employer during the marriage, was subject to equitable distribution.

On appeal, Ted argues that the trial justice erred by failing to include interest and appreciation and by not assigning half of the total increase in value of the 401K account during the marriage for distribution. According to Ted, the relevant paragraph in the premarital agreement—stating "*all* future contributions to [the] investment accounts"—means that the accrued interest and the total value of the account from the date of marriage until the date of divorce, in addition to the contributions made by Cindy and her employer during the marriage, should have been divided evenly between him and Cindy. If the trial justice had considered the total increase in value of the account during the marriage, then $373,400 would have been the amount to be divided evenly between the parties.

It is well established that the terms of a premarital agreement are to be enforced unless a party can prove by clear and convincing evidence that the agreement is not enforceable. General Laws 1956 § 15-17-6; *see Rubino v. Rubino*, 765 A.2d 1222, 1225 (R.I. 2001). We note, however,

- 6 -

that Ted has not challenged the enforceability of the premarital agreement, and on appeal he is disputing only the trial justice's application of the relevant provisions of it. Therefore, we look to the language of the agreement. This Court will consider the "usual and ordinary meaning" of the terms in a "clear and unambiguous" contract. *Management Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1173 (R.I. 2019) (quoting *Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 238 (R.I. 2004)). In our opinion, the phrase "all future contributions" is unambiguous; its plain meaning refers to the active deposits made to the 401K account by Cindy and by her employer. The appreciation in the value of an investment account based on interest or growth in value of the investment funds to which an individual allocates contributions is distinct from the actual deposits, or contributions, made by the account holder. Here, the section of the premarital agreement providing Ted with half of the contributions to the investment accounts clearly states "contributions" and is silent about the appreciation of the value of the account or interest added to it. We are of the opinion, therefore, that the trial justice did not err in determining that the amount of Cindy's 401K account subject to equitable distribution was $158,950.05.

In the alternative, Ted argues that the appreciation of the 401K account during the marriage was a marital asset, the entirety of which should have been subject to equitable distribution pursuant to G.L. 1956 § 15-5-16.1. Ted contends that, if this Court determines that the premarital agreement was silent about the appreciation of the 401K account, then the trial justice had the discretion to consider the entire amount of appreciation as an asset to be equitably divided but erred by failing to consider any of the factors enumerated in § 15-5-16.1.

The appreciation of the value of an investment account may be subject to equitable distribution pursuant to § 15-5-16.1(b). *See Marsocci v. Marsocci*, 911 A.2d 690, 699 (R.I. 2006). Section 15-5-16.1(b) states, in pertinent part, that "the court may assign the appreciation of value

from the date of the marriage of property or an interest in property which was held in the name of one party prior to the marriage which increased in value as a result of the efforts of either spouse during the marriage." As noted previously, however, the trial justice clearly considered Cindy's 401K account to be governed by the plain language of the parties' premarital agreement. Moreover, the record before us does not contain any evidence to demonstrate how the total appreciation in value of Cindy's 401K account could be attributed to the $256,000 in the account at the time of the marriage as compared to the contributions made after the date of the marriage. Nor does the record provide any insight into the "efforts" made by either spouse to increase the value of the 401K account. The appreciation or depreciation of an investment account is generally attributable to market forces and not to the individual efforts of either spouse. We discern no cause therefore to disturb the trial justice's allocation of the 401K account.[3]

## 2

### Morgan Stanley Account

Cindy's Morgan Stanley investment account was also included in the premarital agreement; contributions made to this account during the marriage, in the event of termination of the marriage, were to be divided equally between Cindy and Ted. At the time of the execution of the premarital agreement, Cindy's Morgan Stanley account value was $200,000. The trial justice

---

[3] We acknowledge that we have previously affirmed a trial justice's division of the appreciation in value of an asset that had been designated as solely owned by one spouse in the parties' premarital agreement when the premarital agreement was silent about how or whether to divide the appreciation in value of this asset. *Ryan-Gamron v. Gamron*, 47 A.3d 333, 334, 335 (R.I. 2012) (mem.). In that case, the parties agreed that their premarital agreement was silent as to the appreciation in value of the asset—real estate owned solely by the husband at the time of the marriage. *Id.* at 334. The wife had used the property in the day-to-day operations of her daycare business during the marriage, and she challenged the trial justice's determination of the appreciated value of the property that had been used to divide the asset between the parties. *Id.* at 333, 334, 335. The facts of the case are clearly distinguishable from the case at bar.

allocated the entire increase in value of the account as the sum to be divided between Cindy and Ted because Cindy had been unable to provide documentation to show the total contributions to the account during the marriage. Ted does not dispute the trial justice's decision to allocate the entire increase in value of the account, but he does challenge the trial justice's decision not to offset Cindy's half by the $33,600 that she withdrew from the account during the divorce proceedings to cover some housing costs and attorneys' fees for herself and for Ted. The trial justice concluded that "[a]ny monies withdrawn from the [account] in violation of the automatic [o]rders are determined as monies needed by Cindy in the prosecution of this divorce and need not be added back into the value of the Morgan Stanley accounts." Ted contends that this resulted in the assignment of a portion of Cindy's attorneys' fees to Ted without first making a determination whether she was entitled to a contribution from him for the attorneys' fees. Ted emphasizes that the trial justice ordered him to repay the $6,000 he had withdrawn from one of Cindy's accounts to pay for his attorneys' fees.

After thoroughly reviewing the excerpted trial testimony and the trial justice's decision in this matter, it is our opinion that she did not abuse her discretion by choosing not to offset Cindy's withdrawals from the Morgan Stanley account. As previously stated, we accord great deference to the trial justice's findings of fact. She found that this withdrawal was "needed by Cindy in the prosecution of this divorce[,]" and we have no reason to second-guess this finding, especially in light of Cindy's testimony that she spent this money on rent to sustain housing for Ted in Newport and for herself in Hingham, Massachusetts, and in Middletown, as well as to pay attorneys' fees for herself and Ted. *See Bober v. Bober*, 92 A.3d 152, 161 (R.I. 2014). A trial justice is imbued with "wide discretion to divide the marital property justly and fairly between the parties." *Wu-Carter v. Carter*, 179 A.3d 711, 718 (R.I. 2018) (quoting *Stephenson v. Stephenson*, 811 A.2d

- 9 -

1138, 1141 (R.I. 2002)). We are well satisfied that the trial justice was acting within her discretion in distributing Cindy's Morgan Stanley account.

**B**

**Middletown Property Expenses**

The trial justice determined that Ted's liabilities to Cindy included a $10,000 withdrawal from the parties' joint California Republic Bank account to use as a deposit for an ultimately unsuccessful property acquisition in Middletown. Ted argues that the trial justice abused her discretion when she included this amount as part of Ted's liabilities to Cindy and that the trial justice should have ordered Ted to return the $10,000 to the joint account to be divided equally between them.

The trial justice also concluded that Ted incurred an additional $7,500 for expenses in connection with the purchase and sale agreement for this property. Ted argues that the trial justice abused her discretion when she did not consider the $7,500 Ted claimed for what he spent on attorneys' fees and on an architect employed during the unsuccessful property acquisition as part of the liabilities to be equitably divided between the parties. Ted asserts that he invested in the property for the benefit of the entire family.

In considering the distribution of the California Republic Bank account, the trial justice determined that Ted withdrew $10,000 in conjunction with his execution of the purchase and sale agreement for the Middletown property. She further found that, at that time, "Ted was looking to 'invest' in property on Aquidneck Island" and was aware that Cindy was no longer interested in living in Newport because "the marriage had failed." Moreover, Cindy never signed or approved the purchase and sale agreement. The trial justice further found that the $7,500 for expenses incurred by Ted in connection with the agreement were "his and his alone."

- 10 -

Given the trial justice's wide discretion to decide how to allocate or offset spending from marital assets by one spouse during the marriage, we find no error in the trial justice's decision in this case to consider Ted's spending on the property as a unilateral decision which should be offset in the calculation of Ted's liabilities owed to Cindy. *See Bober*, 92 A.3d at 161.

## C

### Individual Bank Accounts

The trial justice found that Cindy and Ted each had a bank account in their individual names and awarded Cindy the entire balance of her bank account with Citizens Bank (approximately $10,000) and Ted the entire balance of his bank account with BankNewport (approximately $2,000). Ted argues that the trial justice erred when she awarded Cindy the entire balance of the Citizens Bank account and did not include the value of this account in the assets to be equitably divided between the parties. The trial justice offered no explanation with respect to the distribution of these two accounts. Neither account is specified in the premarital agreement, nor are they "assets owned jointly by the parties" that must be divided equally under the terms of the agreement. In light of the trial justice's overall findings and the fact that these two accounts were held in individual names, we are hard-pressed to conclude that the trial justice abused her discretion. "Marital assets are to be divided equitably, though not necessarily equally." *Bober*, 92 A.3d at 162 (brackets omitted) (quoting *Ruffel v. Ruffel*, 900 A.2d 1178, 1193 (R.I. 2006)).

After reviewing the record and considering all of the trial justice's allocation of the assets, it is our opinion that the trial justice did not abuse her discretion when she allocated the entire value of each of these bank accounts to the respective title holder. *See Vieira*, 150 A.3d at 618.

# D

## Child Support

The trial justice ordered Ted to pay $250 per week in child support. Ted argues that the trial justice erroneously calculated his child support obligation by considering his work history for seven years before the time of the trial, resulting in a finding that Ted's earning capacity was double what he reported as his earnings at the time of the proceedings. Cindy counterargues that the trial justice "considered several sources" to determine Ted's income level for purposes of calculating child support and did not overlook any evidence or abuse her discretion.

"[Section] 15-5-16.2(a) provides that the Family Court shall order either or both parents owing a duty of support to a child to pay an amount based upon a formula and guidelines adopted by an administrative order of the Family Court." *Trojan v. Trojan*, 208 A.3d 221, 229 (R.I. 2019) (quoting *Vieira*, 150 A.3d at 618). "Moreover, we consistently have held that § 15-5-16.2, in conjunction with the support guidelines, requires the trial justice to review the worksheet to determine the base level of child support that the noncustodial parent is required to pay." *Id.* (quoting *Vieira*, 150 A.3d at 618). "It is well established that the appropriate award of child support is to be determined by the trial justice in his or her sound discretion, and we shall not disturb such a determination on review absent a clear abuse of that discretion." *Id.* (quoting *Tamayo v. Arroyo*, 15 A.3d 1031, 1035 (R.I. 2011)).

Our review of the trial justice's decision reveals that she made the child support determination after taking into account each party's DR-6 financial statement, personal income tax returns for each party for the years 2008-2010, and corporate tax returns for Ted's business. She noted that the solely-owned business listed cash accounts of over $98,000 and a loan due to Ted of $145,000. The trial justice completed and attached the Child Support Guideline Worksheet to

- 12 -

her decision. The worksheet showed that she considered Ted's monthly gross income to be twice what he had listed on his DR-6 as his income, the latter of which was exclusively a reflection of the rental income from his business's property. The trial justice also considered Ted's "desire to retire by the age of 50; his desire to avoid the so-called 'rat race[.]'"

We have long held that the determination of child support involves the "exercise of [the trial justice's] discretionary authority[,]" *Vieira*, 150 A.3d at 618, and "does not rest solely on [a parent's] present earning capacity." *Id.* at 617 (quoting *Sullivan v. Sullivan*, 460 A.2d 1248, 1250 (R.I. 1983)). Prior work experience and history are relevant considerations, especially when the parent with whom the minor children do not primarily reside are voluntarily under- or unemployed. *See id.* at 617-18. In our opinion, the trial justice did not abuse her discretion when she found that Ted's annual earning capacity was $120,000 based on his prior employment history. *See id.* at 618.[4]

## IV

### Conclusion

For the reasons stated herein, the Family Court's judgment is affirmed. The record of this case shall be returned to the Family Court.

---

[4] Ted also argues that the trial justice erred by not allowing him to inquire about Cindy's "conduct" during the marriage, citing that this was a permissible area of inquiry pursuant to G.L. 1956 § 15-5-16.1 for assets and liabilities not addressed by the premarital agreement. Ted refers to the portions of the trial testimony in which he was not allowed to explore a rekindled relationship Cindy may have had during the marriage with an old beau or a conversation Cindy may have had with an attorney about the distribution of their assets pursuant to the premarital agreement prior to the start of the divorce proceedings. Cindy counterargues that the reason Ted gave during trial for proceeding with his inquiry into these topics was to challenge Cindy's credibility, therefore he has waived his argument on appeal about the relevance of these lines of inquiry for the statutory distribution of assets. We agree. *See In re Madlyn B.*, 187 A.3d 1105, 1123 (R.I. 2018). Moreover, even if Ted had properly preserved this argument, this Court would not be able to determine whether any error in not permitting these lines of inquiry was prejudicial to Ted without the full transcripts of the entire trial before us.

- 13 -

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Raymond T. Boschetto v. Cindy M. Boschetto. |
| **Case Number** | No. 2018-217-Appeal.<br>(N 15-115) |
| **Date Opinion Filed** | January 27, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Newport County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Pamela M. Macktaz |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Joseph F. Hook, Esq. |
| | For Defendant:<br><br>Thomas M. Dickinson, Esq.<br>Richard E. Updegrove, Jr., Esq. |